**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Shafter W. SUMMERS,
Defendant-Appellant.**

No. 78–5351.

United States Court of Appeals,
Fifth Circuit.

July 9, 1979.

***

10. *Berger v. United States*, 295 U.S. 76, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

Otto E. Simon, Mobile, Ala., John Patterson, Edmon L. Rinehart, Montgomery, Ala., for defendant-appellant.

Wm. A. Kimbrough, Jr., U. S. Atty., William Favre, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

Before GODBOLD, SIMPSON and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

Defendant-appellant Shafter W. Summers was convicted of two counts[1] of violating the Hobbs Act, 18 U.S.C. § 1951 (1976). He was sentenced to concurrent four-year confinement terms on each count, and was fined ten thousand dollars on each count. We find no merit in the various grounds assigned by appellant as reversible error and affirm.

## I. FACTS

Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we summarize the proof at trial as to each of the counts upon which appellant was convicted.

### Count 2—Meador

Appellant Summers was a member of the City Council of the City of Prichard, Alabama, as well as Chairman of the City of Prichard Water and Sewer Board. At the same time, Alva B. Meador was engaged in the utility contracting business through his firm, Meador Contracting Company. Meador submitted a sealed bid on a water line construction project the City of Prichard was about to undertake. On April 12, 1976, all bids were opened; on April 26, 1976, Meador's firm was designated as the successful low bidder; on May 10, 1976, a formal contract was executed. Some time after the bids were opened but before the formal contract was executed, appellant Summers spoke with James D. McCrory, Assistant Superintendent of the City of Prichard Water and Sewer Board. Summers instructed McCrory to contact Meador and tell Meador that if he wanted to receive the contract on the water line construction project he would have to "come up with

---

1. The jury returned guilty verdicts on Counts 2 and 3 of the indictment, but was unable to reach a verdict on Count 1. The district judge declared a mistrial as to Count 1.

five percent of the total bid price". McCrory followed Summers' instructions, met with Meador, and informed him of the terms of Summers' demands. Meador agreed to pay; thereafter, the contract was executed. Meador subsequently met with McCrory on four occasions, at which meetings he gave McCrory cash payments of $5,000, $5,000, $5,000, and $3,260.82, respectively. McCrory then brought the cash obtained from Meador to Summers. With the exception of the last "payment", Summers kept all the money: Summers only kept half of Meador's last "payment", and gave the balance to McCrory.

Meador was never contacted directly by Summers with regard to these "payments", nor did he ever have any conversations with Summers about payment of money in return for being awarded the construction contract.

### Count 3—Harris

Joseph Edward Harris was engaged in 1972 through 1976 in performing construction work (installation of storm drainage) for the City of Prichard, Alabama, through his firm J. E. Harris Company, Incorporated. Harris had several contracts with the city, each of which was awarded after Harris submitted the lowest bid of all contracting firms competing for these projects. After Harris commenced work on his first project for the City, for which the total contract price was $900,000, he was contacted by appellant Summers. Summers told Harris that he expected Harris to pay two percent of the contract price as work progressed. Harris agreed to do so, for he felt that city officials and inspectors would retard periodic payments for work completed if he did not accede to Summers' demands.[2] Harris paid Summers the two percent payments in cash as they fell due. Due to inflation, Harris found it necessary in 1974 to seek a unit price increase on his contract with the city. Harris then met with appellant Summers and another city councilman.

Summers informed Harris that he and the other councilman could help Harris obtain the increased unit prices in exchange for an increase in the payments to Summers from two to five percent of the contract price. Harris agreed, increased his cash payments to appellant Summers, and completed performance of his contract with the city.

## II. HOBBS ACT—EFFECT ON INTERSTATE COMMERCE

Appellant contends that the evidence adduced by the government at trial was insufficient to establish an essential element of a Hobbs Act violation—an effect upon interstate commerce. Specifically, Summers raises two points of asserted error. First, he argues that the district court erred in denying his motions for judgment of acquittal on Counts 2 and 3 because there was insufficient evidence to establish that interstate commerce had been affected. Second, appellant claims that the district court erred in charging the jury that, as a matter of law, interstate commerce had been affected if the jury was convinced, beyond a reasonable doubt, that the underlying factual predicate for such a finding had been proven. Both positions are without merit.

### A. Hobbs Act Jurisdiction

Appellant Summers was convicted of two counts of violating the Hobbs Act, 18 U.S.C. § 1951 (1976), which provides in pertinent part:

(a) *Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by* robbery or *extortion* or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

---

**2.** Under the terms of Harris' contract with the City of Prichard, he received monthly installment payments on the basis of the amount of construction satisfactorily completed. Verification of compliance of construction with contract specifications was made by city inspectors.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951 (1976) (emphasis added).

■ This statute "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery, or physical violence." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960); *United States v. Chiantese,* 582 F.2d 974, 980 (5th Cir. 1978), *cert. denied,* ── U.S. ──, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979); *United States v. Hyde,* 448 F.2d 815, 837 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). Cases construing the Hobbs Act have repeatedly emphasized that the statute's plain terms outlaw interference with interstate commerce "in any way or degree". *Stirone v. United States,* 361 U.S. at 215, 80 S.Ct. at 272; *United States v. Chiantese,* 582 F.2d at 980; *United States v. Amato,* 495 F.2d 545, 548 (5th Cir.), *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 286 (1974). All that is necessary is that the impact of the extor-

tion affect interstate commerce to a *minimal* degree. *United States v. Nadaline,* 471 F.2d 340, 343 (5th Cir.), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973); *United States v. Hyde,* 448 F.2d at 837.

■ Viewing the evidence adduced at trial in the light most favorable to the government, *Glasser v. United States, supra,* we conclude that the district court did not err in denying appellant's motions for judgment of acquittal. We find that there was sufficient evidence of an effect on interstate commerce as required by the Hobbs Act. With respect to Count 2, Meador testified that some of the equipment used in performing his contract with the City of Prichard was manufactured outside the State of Alabama. He also testified that at the time he was performing this contract, his firm conducted business in the states of West Virginia, Kentucky, and Mississippi. With respect to Count 3, Harris testified that several pieces of heavy equipment, purchased specifically for use in performing his contract with the City of Prichard, were manufactured out-of-state.[3]

Both Meador and Harris were sufficiently involved in interstate commerce to warrant Hobbs Act protection against extortion: failure to comply with appellant's extortionate demands might have resulted in a loss of Meador's or Harris' respective contracts with the city or might have significantly affected payments thereunder, with the possible result that future orders for new and replacement equipment would be affected. This minimal effect on interstate commerce falls within the broad language of the Hobbs Act. *Cf. Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d

**3.** Various pieces of equipment were necessary for performance of Harris' contract with the City of Prichard: dragline, gradeall, backhoe, and Caterpillar bulldozer. Harris testified that the Caterpillar equipment was manufactured in Illinois, the gradeall in Illinois, and the dragline in Tennessee.

On this appeal appellant criticizes the government's reliance upon this testimony. Appellant finds objectionable the fact that this information was elicited through leading ques-

tions of a government witness testifying under a grant of immunity. At trial, counsel for appellant made no objection to the government's questions as being leading. *See generally* Fed. R.Evid. 611(c). Counsel did interpose timely objections to these questions on the grounds of relevancy and materiality, claiming that these facts did not establish nor were material in establishing the requisite interstate commerce element under the Hobbs Act. The district court properly overruled these objections.

252 (1960) (ready-mix concrete business' dependence upon shipments of sand from out-of-state sufficient for Hobbs Act jurisdiction); *United States v. Chiantese,* 582 F.2d 974 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979) (parking lot operator's purchase of apparel for employees from out-of-state, purchase of gasoline for lot's automobiles with credit cards issued by out-of-state companies, purchase of insurance from out-of-state insurer, and parking of out-of-state automobiles in the lot on a continuing basis sufficient for Hobbs Act jurisdiction); *United States v. Tropiano,* 418 F.2d 1069 (2d Cir. 1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970) (rubbish collector's sur-render of right to solicit additional customers sufficient to invoke Hobbs Act jurisdiction where future out-of-state orders for trash receptacles for new customers were thereby curtailed). The cases on which appellant relies are clearly distinguishable and, therefore, inapposite.[4]

## B. *Jury Instruction*

■ Appellant asserts that the district court erred in charging the jury on the issue of whether interstate commerce had been affected. The court's charge on Count 2 was as follows:

> Now, under the evidence, with reference to Meador Contracting's business and their activities with reference to inter-

---

**4.** In support of his contention that there was insufficient evidence of an effect on interstate commerce, appellant cites three cases. *United States v. Elders,* 569 F.2d 1020 (7th Cir. 1978); *United States v. Merolla,* 523 F.2d 51 (2d Cir. 1975); *United States v. Critchley,* 353 F.2d 358 (3d Cir. 1965).

In *Elders* appellant's major contention for reversal was that the government failed to show the victim corporation's involvement with interstate commerce at the critical times charged in the indictment. The government argued that there was at least a de minimis effect on interstate commerce, sufficient to meet the jurisdictional requirement of the Hobbs Act, where: (a) the victim corporation used equipment which was manufactured or purchased out-of-state; and (b) the victim corporation was engaged in out-of-state work during the period in question. The Court of Appeals for the Seventh Circuit rejected each of these government positions; however, in doing so it repeatedly emphasized there could be no realistic probability that the victim corporation would purchase replacement or new equipment, or might obtain additional out-of-state work, when it had terminated business operations through liquidation at the end of the period in question. There was no evidence in the instant case that either Harris' or Meador's firms had ceased operations at the time of trial; in fact, both Harris' and Meador's testimony can be read as indicating that both their firms are still functioning. Therefore, a realistic probability existed that future equipment orders and solicitation of out-of-state business would be affected by appellant's extortionate activities.

In *Merolla,* the Court of Appeals for the Second Circuit reversed appellant's conviction under the Hobbs Act, holding that there was insufficient evidence of interference with interstate commerce to support the jury's verdict. The government argued, *inter alia,* that appel-lant affected interstate commerce by forcing the victim corporation to desist from engaging in, or being involved with, interstate commerce since the victim corporation's sub-contractors purchased materials and supplies from out-of-state. In rejecting this contention, the court emphasized that the victim corporation was a "one-shot deal", not an on-going business with recurrent interstate purchases, and that there was no reason to believe that the victim corporation would have made future interstate purchases of goods. Again, the victim corporations in the case at bar were, at the time of trial, on-going businesses which had made interstate purchases and were involved in conducting business in other states. It was therefore reasonable to believe that appellant's extortionate activities would have some effect on future interstate purchase of equipment and solicitation of interstate business.

Finally, in *Critchley,* the indictment charged the appellant with unlawfully affecting the interstate movement of slag roof covering material. Appellant's conviction was reversed, the Court of Appeals for the Second Circuit holding that there was a *complete absence* of proof that appellant's activities obstructed, delayed or affected interstate commerce in slag roof material. The court observed that the government's evidence only established that the appellant successfully solicited and received a bribe. The inference to be drawn from the *Critchley* opinion is that there was no evidence that the victim corporation purchased "slag roof" from out-of-state; the opinion merely refers to evidence of "four-ply roof". Aside from the presence of evidence in the case at bar showing use of equipment manufactured out-of-state in performing Meador's and Harris' contracts with the city, there was also evidence of Meador's business activities in states besides Alabama. *Critchley* therefore, is distinguishable.

**456**

state commerce, if you are convinced, beyond a reasonable doubt, of the truthfulness of that, I will tell you, as a matter of law, that it did affect commerce as that term is defined and used in the offense that this defendant is charged with.

Supp. Record, vol. 4, at 1043.

The court similarly instructed the jury with respect to Count 3 as follows:

There are three essential elements and this is true with respect to count three also. So I won't have to repeat that. These three things must be established by the Government beyond a reasonable doubt that the defendant induced his victims to part with property. Second, that he did so by extortion as defined in these instructions and, third, that in doing so interstate commerce was delayed, interrupted or adversely affected. I have already told you if you are convinced beyond a reasonable doubt of the truthfulness about commerce that it is, as a matter of law, that third element is satisfied.

Supp. Record, vol. 4, at 1045–46.

Appellant's argument appears to be that the trial judge's instruction erroneously deprived the jury of its role in finding the facts regarding interstate commerce where the evidence of the effect on interstate commerce is "thin" or amounts to a "scintilla". This argument is unsound.

In *United States v. Hyde,* 448 F.2d 815 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), this Court rejected a substantially analogous objection to a similar instruction.[5] This result was based on our holding that the question of whether facts alleged in an indictment meet the statutory requirement of affecting interstate commerce is for the court, and not for the jury, to decide.

All of the Hobbs Act cases agree that the court should determine whether the facts alleged meet the statutory requirement of affecting interstate commerce. . . . This approach is used rather than telling the jury in general terms what it means to affect commerce and allowing the jury to determine whether the facts meet this criterion, because this is a jurisdictional element for which the court has a great responsibility. It is for the jury to determine whether the facts have been proved, that is, *whether they believe the evidence* with respect to the factual elements of the indictment as explained in the charge.

448 F.2d at 839, 841 (citations & footnote omitted, emphasis in original). *Hyde* recently has been reaffirmed by this Court in dealing with an appellant's argument that a district court erred in instructing the jury that an effect on interstate commerce

5. The instruction given in *Hyde* was as follows:

Now, Ladies and Gentlemen of the Jury, it is the duty of the Court and not the jury to determine whether the government's evidence, if believed, established that interstate commerce was affected by the conduct of the defendant so as to bring the activities of the defendants within the scope of the Hobbs Act and sustain federal jurisdiction.

I instruct you that if you find from the evidence beyond a reasonable doubt, that a conspiracy existed as charged in Count One or in Count Two or in both Counts One and Two of the indictment, and that one of the overt acts charged in each count was committed, that the Court has found, as a matter of law, that the requirements of the Hobbs Act under Section 1951 of Title 18 of the United States Code have been met as to interstate commerce being affected.

 \*     \*     \*     \*     \*     \*

Now, as to Count Three, I charge you that if you find from the evidence, beyond a rea-

sonable doubt, one or more of the defendants named in this count, to be guilty as charged, the Court has found, as a matter of law, that the requirements of the Hobbs Act, that interstate commerce has been affected, has been met by the government's evidence, if believed.

 \*     \*     \*     \*     \*     \*

As to Count Four, I charge you that if you find one or more of the defendants named in this count to be guilty from the evidence presented to you, beyond a reasonable doubt, the Court has found, as a matter of law, that the evidence in connection with Count Four, if believed, meets the requirements of Title 18, Section 1951, United States Code, insofar as the conduct of the defendants having affected interstate commerce, and thereby sustaining the Court's jurisdiction within the scope of the Hobbs Act.

448 F.2d at 841 n. 35.

had been shown if the government's evidence was believed. *See United States v. Hooper,* 575 F.2d 496, 497–98 (5th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978).[6]

The district judge did not err in instructing the jury as he did with respect to the interstate commerce element of the Hobbs Act. He properly informed the jury that its sole role as trier of fact was to determine whether they believed the government's evidence in this respect beyond a reasonable doubt.

## III. TAPE RECORDINGS

■ Appellant maintains next that the district court committed reversible error in admitting into evidence, over timely objection, a tape recording of telephone conversations and meetings between McCrory and Meador.[7] The basis for appellant's argument is that this evidence is inadmissible hearsay which does not fall within the non-hearsay classification found in Federal Rule of Evidence 801(d)(2).[8] Specifically, appellant contends that the tape recordings were not admissible under Rule 801(d)(2)(E) as a statement made by a co-conspirator of a party made during the course of and in furtherance of a conspiracy because the district court judge expressly found that McCrory was not a co-conspirator. The recordings were not admissible under Rule 801(d)(2)(D), according to appellant, as a statement made by an agent concerning a matter within the scope of his agency, *during the existence of the principal-agent relationship,* because the recordings were made after McCrory commenced working with the FBI, thereby terminating any agency relationship which might have existed between McCrory and appellant Summers.

The district court heard extensive oral argument from counsel regarding the admissibility of testimony *and* tape recordings

6. The district court in *Hooper* instructed the jury that:

> [i]t is the duty of the Court and not the jury to determine whether the Government's evidence, if you believe it beyond a reasonable doubt, established that interstate commerce was affected by the conduct of the defendants so as to bring the activities of the defendants within the scope of the Hobbs Act and sustain Federal jurisdiction.
>
> In other words, with respect to the interstate commerce aspects of the indictment, you need only to decide whether you believe beyond reasonable doubt the evidence offered by the Government to establish an effect on interstate commerce. Therefore, I charge you that the evidence in this case, if you thus believe it, meets the requirements of Title 18, Section 1951, United States Code, insofar as the conduct of the defendants has affected interstate commerce, and thereby sustains the Court's jurisdiction within the scope of the Hobbs Act.

575 F.2d at 497.

7. Appellant also urges that the district court committed reversible error in admitting into evidence the tape recording of a conversation between McCrory and Summers on February 15, 1977. This recording was obtained when McCrory used a tape recorder fastened to his body by FBI Agent Heisler, with whom McCrory was then cooperating. Summers claims that the recording was a warrantless search and seizure and an unconstitutional invasion of his privacy under the Fourth Amendment.

Appellant's asserted ground of error is without merit, for it is firmly established that sound recordings made by a government agent who is a party to a recorded conversation are not a violation of the Fourth Amendment. *See United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Ansley v. Stynchcombe,* 480 F.2d 437 (5th Cir. 1973); *accord, United States v. King,* 587 F.2d 956 (9th Cir. 1978); *United States v. Diaz,* 535 F.2d 130 (1st Cir. 1976); *United States v. Gocke,* 507 F.2d 820 (8th Cir. 1974), *cert. denied,* 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975); *United States v. Santillo,* 507 F.2d 629 (3d Cir.), *cert. denied,* 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975); *United States v. Bonanno,* 487 F.2d 654 (2d Cir. 1973).

8. Rule 801(d)(2) provides:

> **(d) Statements which are not hearsay.** A statement is not hearsay if—
>
> **(2) Admission by party-opponent.** The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

relating to conversations between Meador and McCrory. Government counsel cited several cases [9] in support of his position that the testimony and recordings were admissible as admissions of a co-conspirator. The district judge, at this juncture, expressly stated that he recalled the government's pretrial representation that McCrory was *not* a co-conspirator.

I won't let you take two inconsistent positions on [McCrory's status]. Your position was at the time of discovery that [McCrory] was not a co-conspirator. . .

I am not going to let you say he is a co-conspirator for one purpose and not a co-conspirator for another.

Now, we have to get down to the question of whether, *except on that theory* [that McCrory was a co-conspirator], this would be admissible.

Supp. Record, vol. 2, at 396 (emphasis added). Therefore, the district court found that testimony and tape recordings of meetings and conversations between McCrory and Meador were not admissible under Rule 801(d)(2)(E) because the government previously represented to the court that McCrory was not a co-conspirator. We do not disturb that finding on this appeal; hence, this evidence, if admissible, must fall within the language of Rule 801(d)(2)(D).

The district court also heard extensive argument on the theory that this evidence was admissible under Rule 801(d)(2)(D). During the course of this colloquy appellant's counsel contended that even if the government established the existence of a principal-agent relationship between McCrory and Summers, the government would have to prove that the agency relationship was in existence at the time the statements were made in order for them to be binding upon appellant. Appellant's counsel asserted that the *tape recordings* were not admissible since made after McCrory commenced working for the FBI and terminated his agency relationship with appellant Summers. This argument was rejected by the district court, which admit-

ted into evidence oral testimony by McCrory concerning representations he made during his meetings with Meador, as well as tape recordings of telephone conversations leading up to the fourth meeting and that fourth meeting. We conclude that the district court: (1) properly admitted oral testimony relating to conversations between Meador and McCrory which occurred prior to the time McCrory began cooperating with the FBI; but (2) erred in admitting the tape recordings of telephone conversations leading up to the fourth and final meeting between McCrory and Meador, and the actual fourth meeting. After carefully scrutinizing the record, however, we conclude that this error was harmless in light of the overwhelming evidence offered by the government of meetings and conversations between Summers and McCrory, and McCrory and Meador, which occurred long before McCrory began working with the FBI.

Federal Rule of Evidence 801(d)(2)(D) requires that admissions made by a party's agent be made "during the existence of the relationship". *See generally* 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(D)[01], at 801–37 (1976). *See also United States v. Pena*, 527 F.2d 1356, 1360–61 (5th Cir.), *cert. denied*, 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976) (informant's statements not admission by government because made after his relationship with government had ceased). The government established the existence of an agency relationship between McCrory and Summers: McCrory testified that Summers instructed him to contact and inform Meador that Meador would have to "come up" with five percent of the contract price if he wanted the water line construction project. This testimony was not hearsay because it consisted of appellant Summer's own statements to McCrory. *See* Fed.R.Evid. 801(d)(2)(A). Therefore, Summers made McCrory his agent for the purpose of extracting money from Meador. McCrory followed Summers' instructions, met with

**9.** *United States v. Mendoza*, 473 F.2d 692 (5th Cir. 1973); *United States v. Johnson*, 466 F.2d 508 (5th Cir. 1972); *McGregor v. United States*, 422 F.2d 925 (5th Cir. 1970).

Meador, and obtained the money Summers wanted.

■■ Both Meador and McCrory testified as to what occurred at the first three "payoff" meetings: at each meeting Meador gave McCrory an envelope containing $5,000 in cash. McCrory testified that during his initial conversation with Meador he informed Meador that Summers had instructed him to tell Meador that if Meador's firm wanted the contract Summers would have to get five percent of the contract price.[10] This conversation occurred in April or May of 1976, more than seven months before McCrory began cooperating with the FBI. Since these statements were made "during the existence of the [agency] relationship" they were admissible "nonhearsay" under Rule 801(d)(2)(D).[11]

■ The tape recordings admitted into evidence encompassed telephone conversations between Meador and McCrory arranging the fourth and final "payoff", as well as the actual fourth meeting. These conversations and the fourth meeting occurred after McCrory began cooperating with the FBI in December 1976 or January 1977. As such, any of McCrory's statements were made after his agency relationship with Summers ceased: McCrory could not be working for both the FBI and Summers at the same time.[12] Consequently, the district court erred in admitting as evidence these later tape recorded conversations between McCrory and Meador. But, as we have indicated, our careful review of the record leads us to conclude that this error was harmless beyond a reasonable doubt in light of the overwhelming evidence offered by the government of meetings and conversations between Summers and McCrory, and McCrory and Meador, which occurred long before McCrory began working with the FBI. *United States v. Beasley*, 545 F.2d 403, 405–406 (5th Cir. 1977) (harmless error in Hobbs Act prosecution where there was paucity of inadmissible hearsay erroneously admitted and abundance of properly admitted evidence of guilt); *cf. Lutwak v. United States*, 344 U.S. 604, 619–20, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953) (harmless error where court erroneously admitted co-conspirator's admission after conspiracy had ended when there was overwhelming evidence of guilt); *United States v. Ballard*, 586 F.2d 1060, 1062 (5th Cir. 1978) (admission of hearsay statement made by defendant's sister was error, but harmless error in view of defendant's confession and other overwhelming evidence of guilt). *See generally* Fed.R.Crim.P. 52(a) ("Harmless Error").

## IV. LIMITATION OF CROSS–EXAMINATION

■ Appellant's final ground urged in support of reversal is that his Sixth Amendment right to confrontation was abridged by the district court's limitation of defense counsel's cross-examination of Harris. Defense counsel was able to elicit from Harris that there were other members of the City of Prichard City Council "involved", and that Harris was testifying under a grant of immunity from prosecution for "any and everything", which included his dealings

---

**10.** We note that Meador never had an opportunity to testify about representations McCrory might have made to him about Summers: the district court sustained defense counsel's hearsay objection to the government's questions. The reason offered by the district judge for the exclusion of this testimony was that "[t]his is not a conspiracy count". Supp. Record, vol. 2, at 354. This ruling was made early in the trial, well before the court heard argument from counsel on the applicability of Rule 801(d)(2).

**11.** The fact that both Meador and McCrory were present and testified at trial would not render their testimony nonhearsay, for the statements being offered were not made by the declarants while testifying at a trial or hearing. *See United States v. Sisto*, 534 F.2d 616, 621 n. 5 (5th Cir. 1976); Fed.R.Evid. 801(c).

**12.** The district judge seemed to recognize that the agency relationship between McCrory and Summers had ceased when McCrory commenced working with the FBI, stating: "You see, once they got in touch with the FBI, his agency ceased". Supp. Record, vol. 2, at 410. On the other hand, the district judge made no such finding, as evidenced by the following statement: "Of course, [McCrory] could have been working for both [the FBI and Summers]". *Id.*

with other city councilmen; defense counsel was not permitted to ask Harris the specific identities of the other city councilmen involved, nor was he permitted to delve into the "particulars" of the grant of immunity. Failure of the district court to accord defense counsel extensive cross-examination into the identities of other councilmen involved and the particular terms of the government's grant of immunity, appellant contends, violated his Sixth Amendment rights because it denied him the right to reveal any bias, prejudice, or motive to falsify testimony that Harris might have had. There is no merit to this contention since the permitted cross-examination exposed the jury to facts sufficient for it to draw inferences relating to the reliability of Harris and enabled appellant's counsel to make a record from which he could argue that Harris might have been biased. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *United States v. Elliott*, 571 F.2d 880, 908 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

The right of cross-examination is the primary interest secured by the Sixth Amendment's guarantee that the accused in a criminal prosecution "shall enjoy the right . . . to be confronted with the witnesses against him". *Davis v. Alaska*, 415 U.S. at 315, 94 S.Ct. at 1110. Where the witness the accused seeks to cross-examine is the "star" government witness, providing an essential link in the prosecution's case, the importance of full cross-examination to disclose possible bias is necessarily increased. *United States v. Barrentine*, 591 F.2d 1069, 1081 (5th Cir. 1979). Accordingly, while restrictions on the scope of cross-examination are within the sound discretion of the trial judge, *United States v. Siegel*, 587 F.2d 721, 727 (5th Cir. 1979), "this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment". *United States v. Elliott*, 571 F.2d at 908, *quoting United States v. Bass*, 490 F.2d 846, 857 n. 12 (5th Cir. 1974). The question presented here, therefore, is whether the cross-examination of Harris accorded to defense counsel at trial was sufficient to satisfy Sixth Amendment standards as enunciated by the Supreme Court of the United States in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

In *Davis* the Court reversed the petitioner's conviction for grand larceny and burglary. Prior to trial the state prosecutor in *Davis* moved for a protective order to prevent reference, by defense counsel in cross-examination, to the government's star witness' juvenile record. This witness, Green, at the time of the robbery for which petitioner was tried and convicted and at trial, was on probation by order of a juvenile court after having been adjudicated a delinquent for committing a burglary. In opposing the protective order, petitioner's counsel made it clear that he would introduce Green's juvenile adjudication to show that at the time Green was assisting the police in identifying petitioner he was on probation for burglary. From this defense counsel hoped to show, or at least argue, that Green acted out of fear of possible probation revocation; defense counsel would argue that Green hastily and faultily identified petitioner to shift suspicion away from himself and to petitioner.

In reversing petitioner's conviction and rejecting the conclusion reached by the Supreme Court of Alaska that the cross-examination permitted defense counsel was adequate to develop the issue of bias, the Court said:

> While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. . . . [D]efense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.

*Id.* at 318, 94 S.Ct. at 1111 (emphasis in original).

This Court has had occasion to consider the *Davis* standard in *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The *Elliott* court held, *inter alia*, that the district court's restriction on cross-examination did not rise to the level of violating the appellant's Sixth Amendment rights because: (1) the jury, through the cross-examination permitted, was exposed to facts sufficient for it to draw inferences relating to the reliability of the witness; and, (2) the cross-examination conducted by defense counsel enabled him to make a record from which he could argue why the witness might have been biased.

The cross-examination of Harris by defense counsel in the trial court satisfied these standards. The jury had before it facts sufficient for it to draw inferences relating to Harris' reliability and credibility: Harris admitted that he was involved in giving kickbacks and payoffs to other members of the City of Prichard City Council, and was testifying under a blanket grant of immunity from prosecution. The cross-examination conducted also enabled defense counsel to make a record from which he could argue why Harris might have been biased, as reflected in defense counsel's closing argument.

[Mr. Patterson: Defense Counsel]

Now Harris. Briefly, Mr. Harris—Mr. Harris was under investigation for other matters of which we do not know, nor do we know the extent of. As a result of that, he was asked about Summers. He agrees to cooperate with the FBI, but before he will cooperate he wants to talk to his attorney and he and his attorney say we will not cooperate or give you any information or agree to help you against this man until we get the impunity [sic] from Washington approved by the Court to give me complete and full impunity [sic], not only for what I might be guilty of in this case, but for whatever else I might be involved in in Prichard.

[MR. FAVRE: [Government Counsel]

Excuse me, Your Honor, he says complete and full impunity [sic]. That is incorrect.

THE COURT:

It does not protect him from a perjury charge. It only protects him with reference to any of the transactions they had under investigation against him. Go ahead.

MR. PATTERSON:

Of course, if he comes into Court and tells a lie he is subject to perjury charges. I want to make that very clear. Here he is, a man who is under investigation who has been promised impunity [sic] to testify, you see.

*Would a man shade the evidence to stay out of prison himself? Would he?*

Supp. Record, vol. 4, at 997–98 (emphasis added).

The jury's exposure to the fact that Harris was testifying under a blanket grant of immunity from prosecution for all illegal transactions involving City of Prichard officials distinguishes the case at bar from cases in which we have found an accused's Sixth Amendment right to confrontation has been abridged because of restrictions imposed upon cross-examination of a key government witness. *See, e. g., United States v. Williams*, 592 F.2d 1277 (5th Cir. 1979) (reversible error in restricting cross-examination of key government witness where proffer showed that witness might have volunteered to confess and render testimonial assistance to government on condition that government help witness' brother and girlfriend); *United States v. Crumley*, 565 F.2d 945 (5th Cir. 1978) (district court abused discretion in denying defense counsel right to cross-examine government witness concerning stolen automobile found in his salvage yard to determine whether the witness had any expectations that his cooperation through testifying would persuade the government not to charge him with possession of a stolen automobile). Summers' reliance upon *United States v. Brady*, 561 F.2d 1319 (9th Cir. 1977), and *United States v. Mayer*, 556 F.2d 245 (5th Cir. 1977), in support of his position is misplaced.

In *Brady* the question before the Court of Appeals for the Ninth Circuit was whether the district court had committed reversible error in refusing to permit defense counsel to ask the government's principal witness the name of the person who had supplied her with heroin in prior drug transactions. This witness earlier had been convicted of selling heroin and thereafter granted immunity to testify against appellant. The Ninth Circuit reversed appellant's conviction, finding that the name of the witness' source was relevant for two purposes. First, the source's name was relevant to impeach the witness' testimony that she had not had prior drug dealings in narcotics. Second, and more important, the source's identity was relevant because the identification of the prior source would have lent some support to the defense theory that the witness had implicated appellant to protect herself from her real source, as well as to seek immunity for her son and herself. The court also noted that exploration of the source's identity may have supplied substantial evidence of appellant's innocence by evidence tending to prove that the other person, not appellant, was the source of the heroin in the transaction for which appellant was tried and convicted. In the case at bar, Summers seeks to place himself within the *Brady* paradigm by arguing that the identification of other officials to whom Harris paid kickbacks would lend support to appellant's theory that Harris had implicated appellant to protect himself and the other officials with whom he was really dealing, and would tend to show that some other official was guilty and appellant innocent. The record does not support this contention: there is nothing in the record to show that Harris might have feared physical reprisal from other City of Prichard officials if he testified against them, the type of "fear" which the *Brady* court implied the key government witness had. In fact, Harris was willing to identify these other officials and did so before a grand jury; [13] he was only prevented from doing so at appellant's trial because the district judge did not want to jeopardize or interfere with the government's then on-going grand jury investigation of these other officials. Appellant's reliance on *Brady* in the sense that the identity of other city councilmen would tend to show that someone else, not he, was the guilty party is misplaced: the jury, through defense counsel's cross-examination of Harris, was made aware that Harris had given something of value to other City of Prichard officials besides appellant Summers out of payments Harris was to receive under his construction contract with the city. Hence, this case is unlike *Brady* where defense counsel was not permitted to even elicit from the government's key witness that she had engaged in illicit drug transactions with someone other than Brady when, in fact, she testified on direct examination that she had not had any prior dealings in narcotics.

Reliance upon *United States v. Mayer*, 556 F.2d 245 (5th Cir. 1977) is misplaced. The *Mayer* Court held that the district court abridged the appellant's Sixth Amendment right where it restricted cross-examination of two of the prosecution's key witnesses. Appellant's conviction was reversed because the district court only permitted defense counsel to elicit from these witnesses that they had each pled guilty to one count of a forty-four count indictment, but precluded inquiry into *why* they pled guilty and agreed to testify against appellant. The essence of the Sixth Amendment violation found by the *Mayer* Court was that precluding defense counsel from cross-examining the witnesses as to why they entered guilty pleas denied appellant the opportunity to demonstrate to the jury motives for these witnesses to falsify testimony, *e. g.* to obtain immunity from further prosecution, to receive lenient treatment at sentencing, etc. In the instant case, in contrast, the jury was fully apprised that Harris had received total and complete immunity from prosecution for "all and anything"

13. The grand jury minutes were sealed and forwarded for this court's inspection on this appeal.

related to his illicit transactions with City of Prichard officials. In closing argument, defense counsel challenged Harris' credibility and emphasized that Harris might have falsified his testimony to escape punishment for his own deeds. The jury, in light of this argument and the testimony elicited during cross-examination, could infer that Harris received immunity in exchange for his testimony against appellant Summers. Taking that fact into consideration, the jury's verdict indicates that it found Harris a more credible witness than appellant Summers.[14]

## V. CONCLUSION

Having determined that the single demonstrated error committed by the district court was harmless in light of the overwhelming evidence of appellant's guilt, we affirm the judgment of conviction appealed from.

AFFIRMED.

---

**14.** Examination of other authority cited by appellant, *United States v. Alvarez-Lopez,* 559 F.2d 1155 (9th Cir. 1977), and *United States v. Garrett,* 542 F.2d 23 (6th Cir. 1976), discloses that those cases are also inapposite.