[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 9, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-12336

_____

D. C. Docket No. 03-20450-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARLOS CARDENAS,
ROSA LASSERRE SANCHEZ,
BEATRIZ MARRERO,
a.k.a. Bee,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(May 9, 2007)**

Before TJOFLAT, BARKETT and KRAVITCH, Circuit Judges.

PER CURIAM:

**I.**

Defendants Carlos Cardenas, Beatriz Marrero, and Rosa Sanchez appeal their convictions related to a conspiracy to possess with intent to distribute Ecstacy and the laundering of the proceeds from that conspiracy. For the reasons that follow, we **AFFIRM** the appellants' convictions.

**II.**

On June 27, 2003, a federal grand jury returned a superseding indictment charging twenty defendants with eighty-five counts relating to a conspiracy to possess with intent to distribute methylenedioxymethamphetamine ("MDMA" or "Ecstacy") and the laundering of the proceeds from the importation, sale, and distribution of the drug. Cardenas was charged with conspiracy to possess with intent to distribute and with possession with intent to distribute. Sanchez and Marrero were charged with conspiracy to launder monetary instruments. Sanchez also was charged with two counts of money laundering. Marrero also was charged

2

with two counts of conducting financial transactions with drug proceeds.

The head of the drug conspiracy to which Cardenas, Marrero, and Sanchez were alleged to have belonged was Edward Diaz, a long time drug dealer who had been indicted for distribution of cocaine in the Middle District of Florida in 1998 and, as a result, had fled to Spain where he established a cigarette company. The company's only venture was an attempt to export six containers of cigarettes to Venezuela, but the shipment was held by customs for failure to pay import duties. After this tobacco venture failed, Diaz returned to Miami under the name Eduardo Gonzalez, and, returning to the drug trade, he began to import Ecstacy.

Diaz's Ecstacy enterprise had several facets. Drug couriers would bring the Ecstacy to Miami on commercial flights from Spain. Diaz then would sell the drugs and launder the money by having other participants in the conspiracy carry cash back to Spain to be given to his drug supplier. Cardenas, who had an established relationship with Diaz dating back to Diaz's previous cocaine trade in Florida, was alleged to have acquired both Ecstacy and cocaine from Diaz for distribution. Marrero and Sanchez were alleged to have each made trips to Spain carrying cash to be delivered to Diaz's drug supplier. In return for carrying the cash, the government contended that Marrero and Sanchez received a percentage of the total amount of monies transported.

3

On July 21, 2001, Diaz was arrested as a fugitive from the earlier charges in the Middle District of Florida and a search of his home ensued. During the search, police discovered several notebooks ("drug ledgers") containing numbers and names; some of the names were coded or abbreviated.[1] Although he had been arrested on the earlier cocaine charges, it became clear to the DEA that Diaz was involved in a new drug enterprise. Shortly after his arrest, Diaz entered into a cooperation agreement with the government.

DEA Agent Timothy Reagan lead the investigation into Diaz's Ecstacy dealings and used the drug ledgers seized from Diaz's home to identify other individuals involved. Through a process of matching the names in the drug ledgers to other sources, Agent Reagan was able to identify those he believed to be smuggling Ecstacy into the country and those who were transporting money back to Spain. This technique, however, was unsuccessful in identifying some of the individuals named in the drug ledgers, so Agent Reagan asked Diaz for assistance.

One name that appeared in the drug ledgers was "Bee." During the investigation of this name, Agent Reagan discovered a piece of paper in Diaz's apartment with the letter "B" and four telephone numbers. Two of those telephone numbers matched the telephone numbers for a "Beatriz Marrero" in Diaz's address

---

[1] During the trial of Cardenas, Marrero, and Sanchez, these drug ledgers were admitted as coconspirator statements under Federal Rule of Evidence ("FRE") 801(d)(2)(E).

book, and Diaz later testified at trial that "Bee" was, in fact, Marrero.

Diaz met Marrero shortly after returning to the United States from Spain to begin his Ecstacy business, and Marrero had been introduced to Diaz as someone who could lend him money. Marrero owned the San Mar Insurance Agency and, according to the government, loaned Diaz $100,000 to assist in the starting of his new drug organization. Marrero, on the other hand, testified that she met with Diaz to became a partner in his tobacco business with a focus on securing the release of the cigarettes being held in Venezuela. To secure the cigarettes, Marrero retained an attorney in Venezuela. The attempts were unsuccessful, however, and the cigarettes were incinerated shortly before Diaz's arrest. After the initial business meeting between Diaz and Marrero to discuss the $100,000 loan, Diaz proposed that Marrero also begin taking drug money to Spain for him in return for a percentage of the proceeds. According to Diaz, she accepted his offer and also began changing the denominations of the cash from small bills to large bills to make the funds easier to transport.

At some point, Diaz became concerned that Marrero's travel to Spain was suspicious. As such, Marrero proposed that Sanchez, her employee at the San Mar Insurance Agency, transport the money in her place. Diaz knew Sanchez from his interactions with Marrero at the insurance agency, and he paid her for the trips

5

through Marrero. When attempting to identify Sanchez's name in Diaz's drug ledgers, Agent Reagan was unable to make a direct connection. Agent Reagan asked Diaz, and Diaz told him that the name "Rosa" in the drug ledgers referred to Rosa Sanchez.

In addition to taking money to Spain, Marrero and Sanchez also helped facilitate the purchase of two cars for Diaz. Although she had never worked there, Diaz's girlfriend listed her employer as the San Mar Insurance Agency in connection with the purchase of a Ford Excursion. Agent Reagan also located a check from the San Mar Insurance Agency, which was signed by Sanchez, for partial payment on the Excursion. Diaz also purchased a Jaguar for $35,000 using a check from the San Mar Insurance Agency, which was signed by Marrero.

When arrested, Sanchez contended that she only had traveled to Spain on two occasions to deliver documents for the tobacco company. Marrero also denied any involvement in a money laundering or money courier operation when arrested and claimed to have met Diaz merely to become a partner in the tobacco business. With regard to the two cars purchased by Diaz and his girlfriend, Marrero claimed that these payments were loans to Diaz as a favor.

In one of Diaz's drug ledgers, Agent Reagan found an entry for a "Carlos" accompanied by two telephone numbers. Agent Reagan then matched these two

telephone numbers to an entry in Diaz's address book for a "Carlos," along with one additional telephone number. Using telephone records, Agent Reagan traced two of these three numbers to Maria Cardenas, who is the wife of appellant Carlos Cardenas. According to the government, Cardenas was one of Diaz's drug distributors. Diaz had met Cardenas at a family event and began dealings in cocaine and marijuana in the early 1990s. After Diaz returned to the United States in 2000, he approached Cardenas about becoming an Ecstacy distributor. Cardenas preferred cocaine, however, and, in a compromise, Diaz supplied him with both cocaine and Ecstacy.

Cardenas, Marrero, and Sanchez proceeded to a joint jury trial, which included two other defendants. Both Agent Reagan and Diaz testified on behalf of the government. The only defendant to testify was Marrero. During the trial, several issues arose which are now part of this appeal. First, over hearsay objections and under an instruction to the jury that Diaz's information was not being offered "for the truth" but to show what process Agent Reagan used to continue his investigation, Agent Reagan was permitted to testify as to Diaz's answers to his questions regarding the identities of those listed in the drug ledgers. Second, Cardenas unsuccessfully objected to Diaz testifying as to their previous relationship dealing drugs in the 1990s. Third, the district court denied Cardenas's

7

request for a buyer-seller jury instruction.  Finally, Marrero unsuccessfully moved for a continuance and a mistrial after the government questioned her about an equity check the government alleged had been used to fund the loan from Marrero to Diaz when they first met.

After a lengthy jury trial, Cardenas, Marrero, and Sanchez were convicted.  Cardenas was convicted of conspiracy to possess Ecstacy with intent to distribute in violation of 18 U.S.C. § 846 and possession of Ecstacy with intent to distribute in violation of 18 U.S.C. § 841(a)(1).  Cardenas was sentenced to two concurrent terms of 78 months in prison and three years supervised release.  Marrero was found guilty of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), laundering of monetary instruments in violation of 18 U.S.C. §§ 1956(a)(2)(A) and (a)(2)(B)(i), and laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Marrero was sentenced to concurrent terms of 97 months imprisonment and three years supervised release.  Sanchez was convicted of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Sanchez was sentenced to concurrent terms of 63 months imprisonment and two years supervised release.  Appellants now appeal.

**III.**

*A.    Carlos Cardenas*

1.    Agent Reagan's Testimony

Cardenas first argues that the district court committed reversible error by allowing Agent Reagan to testify as to what Diaz told him when, during the investigation, Agent Reagan asked Diaz to identify the individuals listed in the drug ledgers.   We review the district court's decision to allow this testimony for abuse of discretion.  United States v. Hands, 184 F.3d 1322, 1326 (11th Cir. 1999).

FRE 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Hearsay is inadmissible unless excepted by another rule.  See United States v. Fernandez, 892 F.2d 976 (11th Cir. 1989).  More specifically, a declarant's out-of-court statement made while cooperating with the police is inadmissible if offered for the truth of the matter asserted.  United States v. Perez-Garcia, 904 F.2d 1534, 1540 (11th Cir. 1990).  This is true even when the cooperating individual later testifies at trial because the out-of-court statements

9

"were not made by the declarant[] while testifying at a trial or hearing." United

States v. Summers, 598 F.2d 450, 459 n.11 (5th Cir. 1979).[2]

Cardenas argues that the government here improperly used the out-of-court

statements from Diaz for the truth of the matter asserted and to prove the

government's case. The government concedes that some of Agent Reagan's

testimony exceeded the progress-of-the-investigation rationale and was

impermissible hearsay because it was admitted for the truth of the matters asserted

by Diaz.[3] We conclude, however, that even if this introduction of the actual

identities of the individuals in the drug ledgers was impermissible hearsay, this

error does not require reversal in this case.

Evidentiary decisions do not constitute reversible error unless a substantial

right of the party is affected, and errors affect a substantial right of a party if they

"have a 'substantial influence' on the outcome of a case or leave 'grave doubt' as

to whether they affected the outcome of a case." United States v. Frazier, 387 F.3d

1244, 1266 n.20 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1063 (2005).

Here, we conclude that the error in admitting Agent Reagan's testimony regarding

_____

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions handed down by the former Fifth Circuit before the close of business on September 30, 1981.

[3] The government states that the out-of-court revelations of the actual identities of the individuals listed in Diaz's ledgers were impermissible hearsay.

10

what Diaz told him about the identities of the individuals in the drug ledgers was harmless error because (1) the same information imparted to the jury by Agent Reagan came in through Diaz's own testimony, and, thus, Agent Reagan's testimony did not contribute evidence not otherwise before the jury, and (2) the government properly introduced other overwhelming evidence of Cardenas's guilt. Summers, 598 F.2d at 458-59.

2.      Diaz's Testimony Regarding Prior Drug Dealings with Cardenas

During the trial, Diaz testified regarding how he met Cardenas and about their prior drug dealings together. Before this testimony was introduced, the district court instructed the jury regarding how it might receive the evidence, and made the following statement.

> Second, I had previously told you that evidence of prior bad acts or wrongs or crimes is not admissible to prove the character of the person in order to show that that person committed the bad acts charged in the Indictment.

> Do you remember that? We went over that previously. I said that you may receive this evidence only for a limited purpose and, that is, to explain how the alleged relationship between the participants in the crime charged in the Indictment developed and to explain the alleged mutual trust that existed between the participants.

Diaz testified that he met Cardenas, a distant relative, at a family function. They

11

then began dealing cocaine and marijuana together around 1991, before Diaz fled to Spain. Diaz testified that, after returning from Spain, he approached Cardenas regarding purchasing Ecstacy because of their established business relationship.

We review the district court's decision to allow the admissibility of such evidence for abuse of discretion. United States v. Hands, 184 F.3d 1322, 1326 (11th Cir. 1999).

Under FRE 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." FRE 404(b), however, extends only to extrinsic evidence, and "bad acts" evidence is not extrinsic under FRE 404(b) if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. Utter, 97 F.3d 509, 513 (11th Cir. 1996). Evidence fitting within one of these prongs is governed by FRE 403 and may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. United States v. Fallen, 256 F.3d 1082, 1091 (11th Cir. 2001).

Here, the district court did not err in admitting Diaz's testimony regarding his prior drug dealings with Cardenas because the evidence was introduced for the

12

limited purpose of demonstrating why Diaz turned to Cardenas to distribute the new product line.  United States v. Costa, 691 F.2d 1358, 1360-61 (11th Cir. 1982) ("The trial court did not abuse its discretion in allowing Campbell to testify concerning his prior relationship with Costa, even though his testimony showed Costa previously had dealt in cocaine."); see also United States v. Richardson, 764 F.2d 1514, 1521-22 (11th Cir. 1985).  Because Diaz and Cardenas had an established relationship and the testimony was offered to explain this relationship and why Diaz approached Cardenas to distribute the Ecstacy, the evidence was inextricably intertwined with the evidence regarding the charged offense.[4] Furthermore, the district court gave the jury a limiting instruction to ensure there was no confusion regarding the purpose of this evidence.  United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996) ("We presume that a jury follows the court's instructions.").

---

[4] The term "inextricably intertwined"is defined in United States v. Williford:

> Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and setup of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of the account of the crime, or is necessary to complete the story of the crime for the jury.

764 F.2d 1493, 1499 (11th Cir. 1985).

13

3.      Cardenas's Requested Jury Instruction

A district court's decision not to give a proposed jury instruction is reviewed for abuse of discretion.  United States v. Puche, 350 F.3d 1137, 1150 (11th Cir. 2003).  A defendant is entitled to have a jury instruction presented relating to a theory of defense for which there is any foundation in the evidence, even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility.  United States v. Opdahl, 930 F.2d 1530, 1535 (11th Cir. 1991).  If the requisite evidence exists, the refusal to give a requested jury instruction "warrants reversal only if (1) the instruction is substantially correct, (2) the requested instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense."  United States v. Moorman, 944 F.2d 801, 802 (11th Cir. 1991); see also United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995).

Cardenas argues that the government failed to establish more than a buyer-seller relationship and, therefore, he requested a specific jury instruction on this defense.  "Even if a requested jury instruction is proper, the trial court has some discretion in framing the instruction.  If the charge to the jury adequately and correctly covers the substance of the requested instruction, there is no reversible

14

error." United States v. Lively, 803 F.2d 1124, 1128 (11th Cir. 1986) (affirming district court's refusal to give a "buyer/seller" instruction where the district court had instructed the jury on the elements of a drug conspiracy). Here, the district court instructed the jury on the elements of a drug conspiracy and specifically stated that "a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of one does not thereby become a conspirator." As in Lively, the drug conspiracy instruction here adequately addressed the substance of Cardenas's requested buyer-seller instruction because it noted that a single act does not constitute participation in the conspiracy. See id. at 1128-29. Therefore, the district court did not abuse its discretion when it refused to give Cardenas's requested jury instruction.

4.      Sufficiency of the Evidence

Cardenas also challenges the sufficiency of the evidence and the district court's denial of his motions for judgment of acquittal and for a new trial. Based on a careful review of the record and the parties' arguments, we conclude that the evidence was sufficient to uphold Cardenas's conviction, and we affirm his conviction without further discussion.

15

*B.     Rosa Sanchez*

Sanchez challenges the sufficiency of the evidence as to her conviction for conspiracy to commit money laundering and for laundering of monetary instruments.  Whether there is sufficient evidence to support a conviction is a question of law which we review de novo.  United States v. Tarkoff, 242 F.3d 991, 993 (11th Cir. 2001).  The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. "  Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979)).

Based on a careful review of the record and the parties' arguments, we conclude that, although the government's evidence against Sanchez was not overwhelming, the evidence was sufficient to uphold Sanchez's conviction.

First, Diaz testified that when he warned Marrero that her continued travel between Miami and Spain might raise suspicion, Marrero nominated Sanchez to replace her.  Although Diaz testified that he did not have a direct conversation with Sanchez about the transportation of the monies, he did testify that he instructed Marrero to talk with Sanchez and tell her what to do.  Diaz also testified that to his

16

knowledge, Sanchez agreed to take the money to Spain, and the funds he believed were being transported by Sanchez did end up in the hands of his Ecstacy supplier in Spain. Furthermore, Diaz testified that he paid Sanchez for transporting the money, though these payments were made through Marrero. The government contended that Sanchez took a total of $325,000 to Spain during her two trips.

Second, the name "Rosa" appeared in Diaz's drug ledgers, and he testified during trial that "Rosa" referred to Sanchez, who he identified for the jury. The drug ledgers contained two entries for "Rosa," and Diaz explained that each entry indicated when the money was transported, how much money was transported, and that the money had been received by his drug supplier in Spain. Travel records regarding Sanchez from a travel agency, the governments Treasury Enforcement Communication System ("TECS"), and Iberian Airlines were also introduced by the government to demonstrate that the travel dates listed for "Rosa" in Diaz's drug ledgers corresponded to Sanchez's dates of travel to Spain. The first entry in the drug ledgers for "Rosa" listed the date May 3, and Agent Reagan was able to establish that Sanchez left the United States for Spain on May 4, 2001 and returned on May 6, 2001. The second entry in the drug ledgers for "Rosa" listed the date May 19, and Agent Reagan was able to establish that Sanchez left the United States for Spain on or about May 19, 2001 and returned on May 21. The government also

17

introduced evidence to show that numerous calls had been made between Spain and the San Mar Insurance Agency when either Marrero or Sanchez was in Spain.

Third, although Sanchez did not testify at trial, Marrero was asked about Sanchez's trips during her testimony. Marrero testified that she wanted to purchase two containers of cigarettes from the tobacco company in Spain, but she needed $12,000 each for a down payment. Marrero asked Sanchez for the money, and, according to Marrero, Sanchez agreed. Before giving Marrero the money, however, Sanchez wanted to travel to Spain to meet the tobacco contact in person. According to Marrero, she drew up a contract regarding the purchase of the two containers, and Sanchez took the contract to deliver during her trip to Spain to meet with the tobacco supplier.

Agent Reagan testified that, during a post-arrest interview, Sanchez admitted that she had traveled to Spain twice, but she claimed that she had traveled to Spain to deliver documents related to the tobacco business, not to transport drug monies for Diaz. Agent Reagan testified that when he inquired further, Sanchez offered no explanation for why her travels were documented in Diaz's ledgers. Sanchez also told Agent Reagan that she was unable to deliver the documents she took to Spain during either trip. Although Sanchez explained that she returned without delivering the documents the first time because of a sick child, she was unable to

18

give Agent Reagan an explanation for having not delivered the same documents during her second trip. Furthermore, the government was able to demonstrate that Marrero made a trip to Spain around May 11, which was between the two times Sanchez traveled to Spain to deliver the contract Marrero had drawn up for the tobacco sale.

Taking this evidence as a whole, we conclude that the jury enjoyed the prerogative to accept Diaz's testimony and the other evidence and draw the reasonable inference that Sanchez knew the money she transported was drug proceeds.

## C.    *Beatriz Marrero*

Marrero challenges the district court's denial of her motion for a continuance and mistrial. The denial of a motion for continuance is reviewed for abuse of discretion. United States v. Bowe, 221 F.3d 1183, 1189 (11th Cir. 2000). A district court's denial of a motion for new trial based upon the ground that the government withheld evidence is reviewed for an abuse of discretion. United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998). "This issue must be decided in light of the circumstances presented, focusing upon the reasons for the

continuance offered to the trial court when the request was denied." United States v. Knowles, 66 F.3d 1146, 1160-61 (11th Cir. 1995) (citation and quotation marks omitted). To the extent Marrero makes a claim of prosecutorial misconduct, this claim is reviewed de novo. United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997).

During direct examination, Marrero testified that by January 2000 she had lost all of her money and credit status. With such limited resources, she argued, she could not have made the $100,000 loan to Diaz as alleged. On cross-examination, the government challenged this assertion by questioning Marrero about an equity check from First Union National Bank for $45,495 on September 7, 2000. Marrero stated she believed these funds went into working capital for the San Mar Insurance Agency. The government, however, showed Marrero a bank statement which illustrated that no deposits had been made into the San Mar Insurance Agency from September to December 2000. Marrero's counsel then requested production of the equity check and the government agreed to provide a copy. Prior to redirect, Marrero's counsel again requested production of the check, but the government claimed it was not available. Marrero then testified that she could not recall the purpose of the check without seeing it, but stated that the money had not gone to Diaz. Marrero's counsel then requested the district court to

20

grant a reasonable opportunity to obtain the check. The Government's rebuttal case ended that evening, Thursday, July 8, 2004, and the court granted Marrero's request for surrebuttal for the following Monday, if the check became available.

On Monday morning, Marrero's counsel informed the court that pursuant to a subpoena issued to the bank, the equity check would be available later that day. Marrero's counsel, therefore, requested a one day continuance. The government objected, alleging that the bank statement presented at trial was in the possession of the defendant and that the defense had been given ample time to prepare. The district court then denied the request for a further continuance.

Later that day, Marrero secured the check and presented it to the district court. The district court, however, denied Marrero's motion to reopen the case. Marrero's counsel proffered that if Marrero had been permitted to testify, she would have stated that after reviewing the check, she recalled that it was deposited by her mother into her mother's bank account, and the funds were to repay her mother for a loan she had given to Marrero to pay certain debts. According to Marrero, the loan from her mother was given before she met Diaz. Marrero also moved for a mistrial at this point. The government responded that Marrero's proffer was dubious because the equity credit line was on Marrero's mother's house, and it would not make sense for Marrero to repay her mother with money

21

from her mother's home. Marrero responded that the credit line was drawn on Marrero's house, not her mother's. The court then inquired as to whether the government had in fact disclosed the bank statement to defense counsel as had been alleged earlier. The government stated it would have to check. Defense counsel noted that, as an indication that it had not been provided, the bank statement admitted at trial did not contain a Bates stamp. The district court denied the motion for a mistrial, finding that the check was just "one little piece of a lot of evidence," and Marrero, "having testified, could have anticipated or addressed these issues if she wished."

The district court commented further on the check issue when, in a February 2, 2005 order, it rejected Marrero's post-verdict motion to dismiss for prosecutorial misrepresentation of evidence and discovery violations. In this order, the district court stated that the issue of the check did not have "any tendency to mislead the jury and prejudice the accused," especially because "the matter was isolated when compared to the overwhelming evidence of guilty [sic] against Marrero and other impeachment against Diaz, and that none of this was tactically or deliberately placed before the jury by the Government in order to prejudice the defendant." The district court also stated that "Marrero's testimony during her case was so contradicted with other lies that this issue was *de minimus* in terms of the jury's

22

weighing her credibility."

The decision to grant a continuance is traditionally within the discretion of the district court. Hicks v. Wainwright, 633 F.2d 1146, 1148-49 (5th Cir. 1981) ("The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel.") (quoting Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L. Ed. 2d 921 (1964)). Here, we conclude that the district court did not abuse its discretion in rejecting Marrero's motion for a continuance. First, the bank statement used by the government to establish that the credit line had been used was not introduced as part of the government's case in chief, but, rather, during cross-examination for impeachment purposes. Second, the government did not have a copy of the check in question. Third, the district court granted Marrero from Thursday evening until Monday morning to acquire a copy of her own check, which she failed to do. Finally, as the district court noted, this was but one small piece of a much larger case. As such, we conclude that the district court did not abuse its discretion by denying Marrero's motions for a continuance and a mistrial.

Marrero also argues that the district court should have granted her motion for a mistrial because of prosecutorial misconduct. Prosecutorial misconduct is

established through a two-part test: (1) the questionable conduct must be improper, and (2) the questionable conduct must prejudicially affect the substantial rights of the defendant.  United States v. Gonzalez, 122 F.3d 1383, 1389 (11th Cir. 1997); United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991).  The ultimate focus is whether the accused received a fair trial.  United States v. Crutchfield, 26 F.3d 1098, 1100 (11th Cir. 1994).  After a review of the record as a whole, we conclude that Marrero has failed to establish that the government's actions here were improper, and, even if such a showing were made, in light of the overwhelming evidence against her, Marrero cannot demonstrate that the conduct prejudicially affected her substantial rights.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's rulings and the appellants' convictions.