**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Martin TUCHOW and Louis Farina,**
**Defendants-Appellants.**

Nos. 84–1350, 84–1364.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1984.

Decided July 19, 1985.

Allan A. Ackerman, Ackerman & Egan, Chicago, Ill., for plaintiff-appellee.

William Bryson, Asst. U.S. Atty., Chicago, Ill., for defendants-appellants.

Before CUDAHY and COFFEY, Circuit Judges, and GRANT, Senior District Judge.[*]

COFFEY, Circuit Judge.

The defendants Tuchow and Farina appeal a jury verdict finding them guilty of violating the Hobbs Act, 18 U.S.C. § 1951.[1] We affirm their convictions, but remand this case to allow the defendants' their right to allocution at the sentencing hearing.

### I.

The majority of the evidence introduced at trial was gathered through the use of taped conversations between Jack Walsh, the government's key witness, and the defendants Tuchow and Farina. On appeal, the defendants dispute the inferences to be drawn from the statements recorded on tape.

Shortly after Jack Walsh purchased a home remodeling company named J.C. Construction in 1979, the FBI approached Walsh and informed him that they had evidence of his participation in a bank fraud. Because of this evidence, Walsh agreed to cooperate with the FBI which was conducting several other fraud investigations in Chicago in late 1979. To aid in these investigations, the FBI placed listening and recording devices throughout Walsh's office and in his telephone. In early 1980, Walsh learned of the Kenton Court condominium rehabilitation project

---

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. § 1951. Interference with commerce by threats or violence

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

\* \* \* \* \* \*

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

from a friend in the construction business and immediately contacted Kaplan, a partner in the project to express his interest in the rehabilitation venture. The other individuals who comprised the Kenton Court partnership were Messrs. Radek and Golding, both of whom testified at trial. After examining the project's blueprints, Walsh concluded that the project did not meet the City of Chicago building code requirements as the building did not have enough fire exits (although he apparently did not inform the Kenton partners of his observations).[2] Walsh then contacted the FBI and told them that he needed a building permit for a job which, in his opinion, did not meet the Chicago building code requirements and that he would contact a friend, the defendant Farina, to get the permit "fixed."

On May 20, 1980, Walsh called Farina and arranged to meet with him at a Chicago restaurant on the following day, May 21, 1980. When he met Farina on May 21, Walsh told him that he needed his help "in getting a building permit through" since the building had "some violations in it." Walsh testified that Farina promised to help for a $2,000 fee and warned Walsh that "now this may cost you a little more you know, whatever the situation takes." Farina, who at the time was the Deputy Commissioner of Sanitation for the City of Chicago, then suggested that he would have to bring the ward committeeman for the area, the defendant Tuchow, into the deal. Later during this May 21 conversation, Farina made several incriminating statements referring to the expected payoffs, including "for God's sake, don't tell people what you give me" and "I'll take it from here. Cause I wanna drop the money first." On June 3, Walsh again met with Farina and gave him $2,000, which was supplied to Walsh by the FBI; and at that time Farina warned Walsh not to show the

money or it would "kill us all." Farina then telephoned Tuchow's office and told Tuchow that he had a client with a building permit problem for Tuchow and told him that "since it's in your ward, I think you should handle it."[3] When Walsh again met with Farina on June 4, at Farina's office in city hall, Farina explained to Walsh that he had spoken with several of his contacts who had indicated that Tuchow was not powerful enough to obtain the building permit. Farina suggested that Walsh wait until Farina was elected alderman in the fall, however, Walsh declined and asked to see Tuchow, to which Farina responded "if you want to take that chance, we'll take it." Farina and Walsh then walked to Tuchow's office. On the way Farina asked Walsh for another $1,000 for Tuchow and he also informed Walsh that it could cost "at least $10,000" to obtain the building permit.

Farina and Walsh arrived in Tuchow's office, where Tuchow explained that his price for the building permit "won't be exorbitant, but it will be substantial." Tuchow also informed Walsh that others would have to be involved. After the meeting, Farina told Walsh that it would cost more than the $10,000 he had previously quoted and that he needed another $1,000 to get Tuchow "going on finding out whoever he has to find out to fix the permit."

On June 11, after receiving money from the FBI, Walsh gave Farina $1,000 to be passed on to Tuchow. During this meeting, Farina again cautioned Walsh not to mention any names since two other aldermen had recently been convicted for fixing a building permit. Farina told Walsh that Tuchow's fee for help in obtaining the permit would be approximately $1,000 per condominium unit or $47,000.

---

**2.** After his initial meeting with Tuchow, Walsh entered into a contract with the Kenton partners on June 9, 1980 to act as the general contractor for the condominium rehabilitation project.

**3.** Farina further explained to Walsh "he'll take it from there. He'll take it from there, and that's it .... We got the right connection. Now if he can't do it, nobody can do it." Farina also told Walsh not to use his name with anyone because of the FBI investigations taking place in Chicago at that time.

In the meantime, the Kenton Court partnership had applied for a Federal Housing and Urban Development loan guarantee commitment of $1.5 million to help finance the project. The application for the guarantee needed to be submitted by June 27, 1980. Thus, Radek, one of the partners in the project, met with Walsh during the week of June 11th to express his concern about the time it was taking to obtain the building permit. Walsh reassured Radek that he would obtain the permit since he had earlier paid money to Farina and Tuchow; Radek responded that he did not believe any payments were necessary since the project was legitimate. On June 25, Tuchow called Walsh and told him that it looked as if the permit would go through. Walsh explained to Tuchow the emergency facing the Kenton Court partners concerning the HUD deadline and Tuchow responded that he would supply Walsh with a letter the next day authorizing Walsh to begin demolition work. During the conversation, Walsh told Tuchow that Farina had quoted a price of $47,000 for Tuchow's assistance; Tuchow responded by asking whether he (Walsh) had given Farina the $1,000 payment and Walsh answered in the affirmative. Later that day Walsh spoke with Golding, one of the Kenton Court partners, and explained that he had made payoffs to various officials for the project and that more money was expected. On June 26, Walsh went to City Hall to pick up the letter authorizing the demolition work. Tuchow and Walsh began to discuss the fee to be paid and Tuchow stated that "well, Louis shouldn't be setting prices .... I don't think I discussed that with him"; he then stated "I think Louie [Farina] misunderstood me. I told him a job like this here, to get you cleared in everything to go ahead. Got to be worth at least fifty up front." Tuchow then inquired, "when can some of this come in" to which Walsh replied, "when you want it." Walsh then agreed to pay Tuchow the following week after Tuchow returned from vacation. Walsh, Tuchow, and Noonan, an employee in the City's building department, then ar-

ranged for a demolition authorization letter to be issued the next day.

It was at this time that the FBI caught wind that Walsh was involved in another bank fraud scheme and directed him to withdraw from the Kenton Court project. As a result, Walsh informed Farina and Tuchow that he could not go forward with the deal because the Kenton partners were not willing to pay Tuchow's fee and refused to repay Walsh the money he had already paid out. Tuchow responded "that's okay, we'll just stop the job." Tuchow also informed Walsh that he did not want to deal with the partnership because "I don't even know them." Tuchow then explained to Walsh that he had put him in a bad spot since he (Tuchow) had already promised "the guy over there" (supposedly referring to Noonan) "a lot more than a couple of grand." Walsh apologetically offered that "if it takes 5 ... if it takes 10 uh, I'll do that and I don't wanna, I don't wanna embarrass myself." Tuchow accepted the $10,000 offer, "if you can get me 10 ... I'll just have to spread that around." In another conversation that same day, Walsh asked Tuchow what would happen if the Kenton partnership attempted to obtain a permit on its own and Tuchow responded "It's up to them ... if they want to go out, they won't get it though."

Over the next several weeks, Walsh began to make periodic payments on the $10,000 promise. On July 24 Walsh made a $2,000 payment to Tuchow and on July 30 he made a $1,000 payment. On October 21, Walsh made another $1,000 payment to Tuchow. During this meeting Walsh asserted that he had paid Tuchow $4,000, $3,000 directly and $1,000 through Farina. Tuchow expressed his frustration to Walsh about Farina's greed explaining that Farina had only given Tuchow $500 of the $1,000 payment intended for Tuchow, while he (Tuchow) had fairly split the proceeds of an earlier payment with Farina.

Sometime in mid-July, 1980, after Walsh informed the Kenton Court partners that he was withdrawing as the general contrac-

tor from the project, one of the partners, Radek, went to City Hall in an attempt to obtain the building permit. There he met Noonan, an employee in the City Building Department, who refused to issue a permit to Radek. Noonan told Radek that the permit had been paid for and was in Walsh's name. When Radek offered to pay the $250.00 permit fee, Noonan told Radek that he could only obtain the permit if Walsh agreed to the transfer. Noonan, testifying at trial, stated that he had been instructed by Tuchow not to authorize any transfer of the building permit at that time. Golding, called by the government as a hostile witness, testified that at a Kenton Court partnership meeting they agreed to contact Tuchow to see what could be done concerning obtaining the building permit.[4] During Golding's meeting with Tuchow, Tuchow demanded $50,000, but the partnership refused to pay this amount. Golding and Tuchow subsequently settled on a $25,000 payment which was to be characterized as a legal fee. Golding, in his testimony to the Grand Jury which was later admitted at trial, told Tuchow that he felt as if he was being extorted to which Tuchow replied that he needed the money "to take care of some people." In the fall of 1980, the Kenton partnership retained another general contractor to begin work on the project. After the general contractor told Golding that the plans were inadequate, Golding responded by telling the contractor not to worry about it since he had "people downtown that would take care of it."[5] Late in the fall of 1980, after the partnership had agreed to pay Tuchow $25,000, the building permit was issued by the building department.

Based upon this evidence the Grand Jury returned a seven-count indictment.

In Count I, Tuchow was indicted for conspiring to extort money from the Kenton Court partnership and from Jack Walsh. Tuchow was also indicted for separate acts of attempting to extort money from the Kenton Court partnership (Count VII) and from Jack Walsh (Counts IV, V, and VI). Farina was also indicted for conspiring with Tuchow to extort money (Count I) and two separate acts of extortion of money (Counts II, III). The jury returned a verdict of guilty on all seven counts. Tuchow was sentenced to concurrent terms of eight years while Farina was sentenced to concurrent terms of four years on each of the counts contained within the indictment.

During the trial, over the defendants' objections, the district court judge allowed certain "other acts" evidence under Fed.R. of Evid.Rule 404(b). On appeal, both defendants claim that the "other acts" evidence was improperly admitted. Further, Tuchow alleges that the district court erred in admitting hearsay evidence of taped conversation between Farina and Walsh prior to Walsh being introduced to Tuchow. The defendants' other grounds for reversal include claims that there was insufficient evidence to support the charges of conspiracy and attempted extortion and further that the evidence was insufficient to establish a nexus between interstate commerce and the extortion payments made by Walsh (Counts IV, V, VI).

II.

A. "Other Acts" Evidence.

Both Farina and Tuchow complain that the district court erred when it allowed receipt of "other acts" evidence under Fed. R.Evid. Rule 404(b).[6] Specifically, Tuchow

---

4. Golding testified that the idea to contact Tuchow came from one of his son's friends who is an attorney in Chicago and had ties to Tuchow.

5. The trial court judge allowed in this evidence since it was offered not to prove the truth of the matter asserted but rather to prove the fact that the statements were made by Golding in order to establish his state of mind. The jury was instructed that it was to consider the testimony in that light.

6. Rule 404(b) states:

"Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of a mistake or accident."

argues that the court erred when it received in evidence a tape recorded conversation between Tuchow and his barber, a Mr. Herzog, wherein Tuchow allegedly offered to bribe a municipal court judge to dismiss a speeding ticket. Farina also argues that the court erred in admitting a taped conversation between himself and Walsh wherein Farina agreed to find a government job for Walsh's nephew for $2,500 and fix a drunken driving ticket for Walsh's uncle for $1,000.

"According to Rule 404(b), evidence of other acts cannot be introduced to establish the defendant's bad character or to show his propensity to commit the act in question simply because he committed a similar act in the past."

*United States v. Chaimson,* 760 F.2d 798 (7th Cir.1985). Rather, this "other acts" evidence is admissible only if:

"(1) The evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ..., (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*Id.* at 804, quoting *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir. 1984); *see also United States v. Stump,* 735 F.2d 273, 275 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 203, 83 L.Ed.2d 134 (1984); *United States v. Kane,* 726 F.2d 344, 348 (7th Cir.1984).

■ Herzog testified that he contacted Tuchow after receiving a speeding ticket in late 1980. In one of the conversations, Tuchow told Herzog that he had discovered the name of the presiding judge on the case and offered to "give him a little, you know, something." In a later conversation, he told Herzog that he had talked to the judge and instructed Herzog to tell the court clerk that "Mr. Tuchow is your lawyer and he's going to try to get out here [to the court]." Tuchow also stated that "the

judge got your name, so he will take care of it." Herzog testified that Tuchow did not represent him as an attorney during his traffic court appearance and that he could not remember the outcome of the case.

Rule 404(b) states that other acts evidence may "be admissible for other purposes, such as proof of motive, opportunity, [or] intent ...." At trial, Tuchow did not deny the fact that he discussed and received money for his efforts in obtaining the building permit. Rather, he characterized these discussions with Walsh and Golding during opening argument and throughout the trial as legitimate exchanges concerning his attorney fees for representing their interests in obtaining the building permit. Intent became an issue once Tuchow characterized his discussions as a legitimate exchange concerning his attorney fees. *See United States v. Price,* 617 F.2d 455, 459 (7th Cir.1979) (issue of intent raised during opening argument opens the door to Rule 404(b) evidence). Since Tuchow's defense at trial related directly to the issue of his intent, the discussion between Herzog and Tuchow where Tuchow contemplated bribing a trial court judge in order to fix a traffic ticket was relevant in assessing Tuchow's characterization of his discussions with Walsh and the members of the Kenton partnership. Thus, the first factor in assessing the admissibility of evidence under Rule 404(b) is satisfied.

This "other act" evidence is also "similar enough and close enough in time to be relevant ...." The conversations with Herzog occurred in late 1980, during the period the application for the building permit was pending. Tuchow contends that the conversations concerned what could be characterized as a bribery attempt and since he was prosecuted for extortion and not bribery his conversations with Herzog were too dissimilar for purposes of comparison. We disagree. Tuchow's defense rested on his assertion that his relationship between Walsh and the Kenton partnership was only one of attorney and client. The government sought to prove that Tuchow

did not regard this relationship as anything approximating an attorney-client relationship. In this regard, evidence of his conversation with Herzog concerning bribing a municipal court judge to fix Herzog's traffic ticket was relevant as Tuchow had proposed to take care of the problem not by legitimately representing Herzog at his trial but by contacting the judge and "giving the judge a little something," which Herzog believed to mean money. The similarity between this conduct and Tuchow's discussions with Walsh and Golding over his "fee" for helping them obtain a building permit is that Tuchow did not undertake to represent these parties as an attorney, but sought to improperly influence particular governmental decisions, whether it be handling a traffic ticket or obtaining a building permit, through the use of money. Both the "other act" evidence and offense charged in this case focused on the conduct of Tuchow. Both acts concerned discussions of distributing money in order to influence an office holder's actions. "The degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent .... The prior acts need not be duplicates of the one for which the defendant is now being tried." *See United States v. Radseck*, 718 F.2d 233, 236–37 (7th Cir.1983) citing *United States v. O'Brien*, 618 F.2d 1234, 1238 (7th Cir.), *cert. denied*, 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980).[7]

The third factor to be considered under Rule 404(b) is whether evidence of the other acts was clear and convincing. In this case, the conversations between Herzog and Tuchow were recorded on tape and Herzog testified that he logically assumed Tuchow's reference to "giving the judge a little something" meant money. Tuchow argues that since Herzog was in fact fined by the trial court for his speeding offense, *albeit* minimally, there is no evidence that a bribe took place. However, the government offered this evidence not to establish the fact that the defendant had completed an act of bribery, but to demonstrate that Tuchow believed, as he told Herzog, that he was capable of fixing the case. The fact that Tuchow's statements were recorded on tape provided direct evidence of the other act evidence and, thus, the clear and convincing standard was met in this case. *See United States v. Dolliole*, 597 F.2d 102, 107 (7th Cir.1979) (direct evidence of defendant's participation in other acts satisfies the clear and convincing standard); *see also, United States v. Hyman*, 741 F.2d 906, 913 (7th Cir.1984).

Finally, if all the other factors are satisfied, the judge must also be convinced that any prejudice from admission of this evidence is outweighed by its probative value. This determination, involving a Fed.R. Evid. Rule 403 determination balancing the prejudice against the evidence's relevance, is reversible only if the district court abused its discretion. *See, e.g., United States v. Falco*, 727 F.2d 659, 665 (7th Cir.1984); *United States v. Weidman*, 572 F.2d 1199, 1201–02 (7th Cir.1978), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). In this case the district court conducted a separate hearing, weighed all of the evidence and, after admitting the evidence, specifically instructed the jury as to the limitations on its use. In our review of the record, we find no abuse of discretion.[8] Thus, we hold that Herzog's testi-

---

**7.** Tuchow compares this case to *United States v. Dothard*, 666 F.2d 498 (11th Cir.1982), which held, in part, that admission of other acts evidence constituted reversible error. *Dothard* involved a defendant who allegedly falsely filed a United States Army Reserve Enlistment Form; however, the defendant in that case denied filling out the form and denied any knowledge of the false answer by the person who did in fact fill out the form. Thus, that case is readily distinguishable since the defendant Dothard denied the act of filling out the form itself. In this case, Tuchow does not deny the discussions concerning the money to be paid for his help in obtaining the building permit. Rather, it is the characterization of those discussions, which directly impacts upon Tuchow's intent and, thus, his guilt or innocence. *See also, Shackleford*, 738 F.2d at 782.

**8.** Tuchow also argues that the district court judge failed to make an explicit finding under Rule 403 and thus the fourth factor under the Rule 404(b) analysis is lacking. However, as this court stated in *United States v. Hyman*, 741 F.2d 906 (7th Cir.1984), the

mony and the taped conversations between Herzog and Tuchow were properly received in evidence under Rule 404(b).

Farina claims that the trial judge erred when he allowed in evidence of tape recorded conversations between Farina and Walsh concerning an agreement that Farina would arrange a job in city government for Walsh's nephew for $2,500 and would fix a drunk driving citation for Walsh's uncle for $1,000. These conversations were recorded on tape and took place in late 1980 and early 1981.

■ Farina's intent, just as Tuchow's, also was an issue at trial. In a Hobbs Act prosecution, "the government is required to prove criminal intent on the part of the accused." *United States v. Price*, 617 F.2d 455, 460 (7th Cir.1979). At trial, Farina did not dispute the fact that discussions took place concerning the exchange of money; rather, he disputed the meaning to be attached thereto. One of Farina's defenses was that he was not engaged in any conspiracy with Tuchow; rather, as suggested in his counsel's opening argument, Farina was merely "conning" Walsh out of some money. *Id.* at 459 (issue of intent raised during opening argument opens the door to Rule 404(b) evidence during government's case-in-chief); *Shackleford*, 738 F.2d at 781 (evidence of other acts may be admissible during government's case-in-chief where defendant raises issue of intent).[9] The evidence that Farina obtained a job for Walsh's nephew for $2,500 and fixed a drunk driving ticket for another $1,000 was relevant in establishing that Farina did not intend to "con" Walsh. This evidence indicated, similar to obtaining the job for

Walsh's nephew and fixing the drunk driving ticket, that Farina intended to follow through on his promise to help Walsh obtain the building permit. Thus, the "other acts" evidence was relevant in establishing his intent to engage in a conspiracy with Tuchow in order to obtain the illegal permit.

■ Moreover, it is uncontested that the evidence of Farina's other acts was clear and convincing since the tape recordings provided direct evidence that Farina obtained a job for Walsh's nephew and fixed the traffic ticket. This type of conduct of bribing government officials is indistinguishable from obtaining an illegal building permit from government officials. Finally, the district court did not abuse its discretion in admitting the "other acts" evidence. The court properly instructed the jury regarding the parameters within which this evidence could be considered, concluding with: "it is very important that you understand the very limited purpose of this evidence; first consider it only as to the defendant Farina; secondly, consider it only on the question of what Farina's knowledge and intent were in the case that is on trial here ...." Although Farina argues that the time occupied at trial concerning the "other acts" evidence (45 pages of transcript) was much greater than the time spent proving his direct involvement in the crimes charged in the indictment (30 pages of transcript), the point where so much other act evidence was introduced as to prejudice his defense was not reached in this case. Thus, the district court did not

"trial court's evidentiary rulings are 'within its sound discretion and must be accorded great deference ....' Further, we have refused repeatedly to require a mechanical recitation of Rule 403's formula, on the record, as a prerequisite to admitting evidence under Rule 404(b)."
*Id.* at 913 (citations omitted). When the correct reasons for the ruling are apparent on the record, we will not presume the wrong ones. *See United States v. Price*, 617 F.2d 455, 460 (7th Cir.1979).

9. During trial, the defense counsel cross-examined Walsh attempting to demonstrate that Farina did not intend to engage in a conspiracy with Tuchow as he (Farina) believed he was simply introducing Walsh to Tuchow in order for the two to establish an attorney-client relationship. During closing argument, Farina's counsel argued that Farina did not act with an unlawful intent since Farina believed that he was introducing Walsh to Tuchow so that Walsh could obtain legitimate legal services from Tuchow. This line of defense was developed after introduction of the other acts evidence.

err in admitting evidence of Farina's previous bribes under Rule 404(b).[10]

### B. State of Mind Testimony.

Tuchow was also indicted for and convicted of attempting to extort $25,000 from the Kenton Court partnership (Count VII). At trial, the government introduced the testimony of Golding and Radek, two partners in the partnership, under the state of mind exception to the hearsay rule, Fed.R. Evid. Rule 803(3).[11] The jury was also instructed that the testimony of Radek and Golding was offered to establish their state of mind at the time of the extortion attempt during the summer of 1980 and not to prove any of the matters asserted therein.

One of the conversations that Tuchow found particularly objectionable occurred on June 19, 1980 between Walsh and Radek. Walsh testified that during this conversation he informed Radek that he had paid money to Tuchow and Farina to obtain the permits. Radek responded that he did not believe that the partnership had to pay bribe money since the deal was legitimate. Tuchow also objected to Radek's testimony that Walsh had told him that he (Walsh) had paid $2,000 to Farina and $1,000 to Tuchow; Radek further testified that since he believed the deal was legitimate there

was no need for the partnership to make payments to city officials. Radek also testified that he went to the building commissioner's office to obtain the permit but that Mr. Noonan, an employee in the city's building department, denied him the permit explaining that a fee had been paid for the permit and he would need a document from Walsh assigning the permit to him. Radek offered to pay the $250.00 fee for the permit, but Noonan refused to accept the offer. Radek returned to his office and discussed the deal with one of his partners, a Mr. Kaplan, while expressing his belief that the building permit was being blocked because certain promised payments had not been made. The defendants objected to this testimony as inadmissible hearsay. Finally, Tuchow objected to introduction of a taped conversation between Walsh and Golding on June 25, 1980, discussing Walsh's progress in obtaining the building permit. During this conversation, Walsh told Golding that he had to "drop a little here and drop a little there," to which Golding responded "oh I know that" and "you don't get nothing done in Chicago without that." Walsh also explained to Golding that he had to pay $2,000 to Farina and $1,000 to Tuchow and Golding responded "oh, yeah. Everybody is on our side." [12]

---

10. Tuchow argues that because the district court allowed in "other acts" evidence as to Farina, the district court should have granted Tuchow's motion for severance of his trial. However, a motion for severance under Fed.R.Crim.P. Rule 14 is committed to the discretion of the district court and its decision will only be reversed upon a "strong showing of prejudice" to the moving defendant. *United States v. Dalzotto,* 603 F.2d 642, 646 (7th Cir.1979). The defendants must show that their joinder deprived them of a fair trial. *United States v. Percival, et al.,* 756 F.2d 600, 610 (7th Cir.1985). After a review of the record, we hold that the court did not abuse its discretion in denying the severance motion given the clear language contained in the court's limiting instructions that the evidence as to Farina's other acts was to be considered against Farina only. *See id.*

11. Federal Rule of Evidence 803(3) provides:
    "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"(3) Then existing mental, emotional, or physical condition.—Statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, claim, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of the declarant's will."

12. The text of the conversation is as follows:
    WALSH: "You know how the situations work down at City Hall, so I wound up uh I hadda drop a uh two grand to Louie and then a thousand to Marty and then uh, you know, to get the show on the road. So I'm drop, you know, and then uh he came back with another figure. I said look, you do what you have to do and get this baby goin so we get some uh work done there. Now the Alderman is definitely interested in seeing that thing improved.
    GOLDING: "Oh, yeah. Everybody is on our side.

■ In a Hobbs Act prosecution under 18 U.S.C. § 1951, the government must establish not only the victim's state of mind at the time of the alleged extortion but also the intent of the defendant.

"In a Hobbs Act prosecution for extortion under color of official right, the government must prove that the victim paid money to the defendant because of the defendant's official position. Evidence of the victim's state of mind is thus an essential element of the government's case. *See United States v. Braasch,* 505 F.2d 139, 151 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). In addition the government must prove criminal intent on the part of the accused. *See United States v. Adcock,* 558 F.2d 397, 402 (8th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977)."

*Price,* 617 F.2d at 459. Radek's and Golding's testimony that they believed they were being extorted established the victim's state of mind and thus one of the elements of the offense.[13]

■ Tuchow, however, specifically complains that since it was Walsh who conveyed the information to Radek and Golding as to the progress made in obtaining the building permit, it was not he, but Walsh who induced their states of mind and thus this testimony should not have been allowed as it was untrustworthy. Admittedly, if Walsh had been Tuchow's agent or had Tuchow spoken directly to Golding and Radek, then their testimony would have been admissible under Fed.R. Evid. Rule 801(d)(2)(A) as an admission of a party opponent.[14] However, Golding's and Radek's testimony definitely reflected their state of mind at the time of the alleged extortion attempts during the summer of 1980 and thus was admissible under Fed.R. Evid. Rule 803(3). Tuchow's complaint that the information which induced their state of mind was relayed to Golding and Radek by Walsh rather than Tuchow is of no consequence since the essential information—that Tuchow had requested payments be made in order to get the permit and that more payments would be required—was correctly conveyed by Walsh to Radek and Golding as evidenced in the taped conversations between Tuchow and Walsh and Farina and Walsh.[15] The indicia of reliability,

WALSH: "So what happened is that Marty, Marty is the committeeman there.
GOLDING: "Humm.
WALSH: "So how can you beat it?
GOLDING: "Yeah.
WALSH: "You know he's my guy.
GOLDING: "Marty Tuchow?
WALSH: "Tuchow, yeah."

13. Further, the testimony of Radek and Golding was relevant evidence as to Tuchow's intent. Certainly, if Radek and Golding testified that they believed the requested payments were for legitimate lawyer fees, Tuchow's claim of innocence would seem to be reasonable. Conversely, if they believed payments were being made because the defendants were city officials and that more payments were being demanded this would provide relevant evidence as to whether Tuchow viewed his demand for payment as an extortion attempt or as legitimate lawyer fees.

14. Tuchow cites *United States v. Summers,* 598 F.2d 450 (5th Cir.1979) to support his position that Golding's and Radek's testimony should have been excluded. In *Summers,* testimony detailing conversations between an FBI informant and one of the victims of the defendant's extortion scheme was admitted at trial. The Fifth Circuit held that the district court erred in admitting this evidence, but found the error to be harmless given the abundance of properly admitted evidence establishing guilt. Our case is distinguishable from *Summers* on two grounds. First, the *Summers* decision noted that the evidence of the conversations was offered to prove the truth of the matter asserted therein and thus should have been excluded as hearsay. In this case, as the jury was instructed by the district court, the evidence was not offered to prove the truth of what was asserted by Radek's and Golding's statements, but rather to prove the victims' state of mind. Further, *Summers* did not analyze whether the evidence would have been admissible under the hearsay exception for state of mind evidence, Fed.R. Evid. Rule 803(3). In this case, the evidence was clearly admitted to demonstrate the state of mind of the victims, Golding and Radek, two partners in the Kenton Court Partnership.

15. As detailed in the fact section of this opinion, the taped conversations between Tuchow and Walsh demonstrate that Tuchow demanded that an additional $47,000 be paid by Walsh and the partnership. Further, Tuchow asked Walsh whether he had paid the $1,000 to Farina intended for Tuchow. This information was correctly conveyed by Walsh to the Kenton part-

which is not present in many hearsay situations, is certainly provided in the taped conversations revealing the details of the extortion scheme. Because the record indicates that the information concerning the payments made to Tuchow and Farina was accurately conveyed to them, it is clear that their "state of mind" was induced by accurate information. Contrary to Tuchow's assertion that such evidence effectively directs the verdict against him, this evidence establishes only one of the elements of the crime—the victim's state of mind. The defendant can still defend his case by demonstrating he did not have the requisite intent. Accordingly, we hold that the district court did not abuse its discretion in allowing this state of mind evidence to be introduced at trial.[16]

## C. Hearsay Conversations.

Tuchow contends that the district court erred when it admitted evidence of taped conversations between Farina and Walsh that occurred prior to the establishment of the conspiracy between himself and Farina. Specifically, Tuchow complains that Farina introduced Walsh to Tuchow on June 4, 1980, and the referred to

ners. In fact, the only misinformation conveyed by Walsh to Radek was the fact that he made payments to Tuchow and Farina totalling $5,000, when in fact he had spent only $3,000 at the time.

16. Tuchow also complains of the limiting instruction given to the jury prior to its consideration of the state of mind evidence. The contested portion of the instruction is as follows:

"Now, one of the questions you are going to have to decide ... is were these legal fees ... or were they extortion payments that were being requested?

"Now, what they were depends in large part upon the intent of these defendants ... [t]hat is really the principal question that you are going to have to decide....

"One of the things that is relevant to that question is what was the state of mind of these developers. What was the effect of what was said on their minds?

"Now you have heard tapes and you are going to hear some more tapes now that have a bearing on that latter question: What was going on in the mind of Mr. Golding when this $25,000 was being discussed ...?

cited conversations (May 21 and June 3) took place prior to the time Tuchow became a part of the conspiracy through his contacts with Farina. Tuchow argues that the evidence constitutes hearsay when used against him and that the coconspirator exception to the hearsay rule does not apply because he was not a member of the conspiracy at the time of conversations between Walsh and Farina; thus, the district court should have at least given a limiting instruction explaining to the jury that these statements could not be considered as evidence of Tuchow's involvement because he had not as of that date joined the conspiracy. The statements that Tuchow specifically complains of occurred during the taped conversations of May 21 and June 3, 1980 between Farina and Walsh. During the meeting on May 21, Farina told Walsh that it would cost Walsh $2,000 to bring someone in to handle obtaining the permit. Farina also instructed Walsh not to mention the terms of their deal to anyone, "for God's sake, don't tell people what you give me." Farina then advised Walsh that he would "take it from there. Cause I wanna drop the money first." Finally, on June 3, emploring "Don't ever show it, don't ever, please," Farina told Walsh that the $2,000

"Now that doesn't mean that this is necessarily the same way Tuchow regarded it, or Farina regarded it. It doesn't mean that at all. He might have had a misunderstanding. That would be, of course, for you to decide, but it is, nonetheless, relevant for you to know or hear evidence of what it was these people were saying at the time."

The judge completed the instruction by cautioning the jury that certain of the taperecorded statements were not offered to prove the truth of the matter asserted but only to indicate the state of mind of the declarant. Tuchow's argument that this instruction somehow prejudiced his case is meritless for two reasons. First, although he objected to the introduction of the evidence he never registered any objection to the language used by the court in the limiting instruction. Second, contrary to Tuchow's suggestion, this instruction did not direct a verdict against Tuchow; rather, the jury was properly instructed that the developer's state of mind may provide some evidence as to whether Tuchow intended the demanded payments to truly represent his attorney fees. *See supra,* note 15. Thus, this instruction did not unfairly prejudice Tuchow's defense in any respect.

payment should be kept out of Walsh's business records. The government argues that these conversations were not offered to prove the truth of the matter asserted (*see* Fed.R.Evid. Rule 801(c)), and thus do not constitute hearsay. Accordingly, the government contends that these statements were admissible against Tuchow. *Anderson v. United States*, 417 U.S. 211, 219–20, 94 S.Ct. 2253, 2260–61, 41 L.Ed.2d 20 (1974).[17]

In this case, Tuchow does not analyze whether the testimony he challenged was being offered to assert the truth of the matter therein or whether it was offered simply as proof of some other matter. Specifically, the statements the defendants complain of relating to Farina's instructions to Walsh not to tell anyone of the pending deal and not to reflect on his records any of the payments made to Farina, including Farina's request for a $2,000 payment, were offered by the government for the sole purpose of explaining the nature and scope of the secretive and conspiratorial scheme to obtain the building permit and to establish the conspiracy itself.[18] *See United States v. Magnus*, 743 F.2d 517, 522 (7th Cir.1984). In *Magnus*, our court held that statements made by the coconspirator prior to the time he joined the conspiracy were admissible as non-

hearsay evidence since the statements were not offered to prove the truth of the statements offered, but rather to set forth the illegality, nature and scope of the anticipated conspiratorial scheme. *See also, United States v. Bobo*, 586 F.2d 355, 372 (5th Cir.1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979).

Further, in *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir.1978), this court held that if a conspiracy is established by a preponderance of the evidence, statements made by one co-conspirator during the course and in furtherance of the conspiracy may be admissible against another co-conspirator. *Id.* at 1134. In *United States v. Coe*, 718 F.2d 830 (7th Cir. 1983), we explained that our ruling in *Santiago* did not change the law in this circuit that where the defendant later became a member of the conspiracy statements made by a co-conspirator during the course and in furtherance of the conspiracy were admissible against the defendant to demonstrate the nature and objectives of the conspiracy which he subsequently joined. *Id.* at 839;[19] *see also Magnus*, 743 F.2d at 521; *United States v. Harris*, 729 F.2d 441, 448 (7th Cir.1984).

In this case, the taped conversations clearly establishes that on May 20 Walsh

**17.** In making its ruling on the admissibility of the co-conspirator statements, the court stated at the end of the trial:

"I think there are very few so-called co-conspirator exception statements in this case. Offhand I can't think of any, but there probably are some. Most of the material to which objection was made as hearsay was not in my view hearsay because it wasn't offered for the truth of what was asserted; but if there were any statements which were offered for the truth of the assertions contained therein, then I find that by the greater weight of the evidence, those statements were made by one or the other of the alleged co-conspirators in furtherance of the conspiracy and during the course of the conspiracy and, therefore, they are admissible against each of the defendants." (Tr. 1133).

**18.** Indeed, as stated in *United States v. Gibson*, 675 F.2d 825, 834 (6th Cir.1982), the proffered "statement was not hearsay under Federal Rule of Evidence 801(c): it was not offered to show

that the substance of [the declarant's] utterance was either true or false. Indeed a suggestion or an order is not subject to verification at all because such utterances do not assert facts." In this case, since Farina's instructions to Walsh were not offered to prove the truth of the matters asserted therein, they did not assert facts subject to verification. Thus, these statements were not hearsay.

**19.** In *Coe*, the defendant Coe and a government informant had extensive discussions as to a possible drug deal. It was not until an April 15, 1982 telephone conversation that Coe told the informant that he (Coe) had obtained a buyer. The court held that evidence of the conversations between the informant and Coe prior to April 15 could not be admitted under the co-conspirator rule, Fed.R.Evid. 801(d)(2)(E), against the defendants who later joined the conspiracy since this was insufficient evidence to establish a "joint venture" or conspiracy between Coe and the informant prior to this date. *See Coe*, 718 F.2d at 840.

called Farina to arrange a meeting to discuss obtaining a building permit and that on May 21 Farina and Walsh met and entered into an agreement to obtain the illegal building permit. During the first portion of the May 21 conversation, Walsh told Farina that he needed help in "getting a building permit through" since the building had "some violations in it." Farina agreed to help if Walsh paid him $2,000. He also told Walsh that it would probably "cost you a little more ...." As required by our *Coe* decision, the necessary conspiracy or "joint venture" (for evidentiary purposes) between Farina and Walsh, the government informant, was established by a preponderance of the evidence at this point. *Coe,* 718 F.2d at 835, 840; *United States v. Gil,* 604 F.2d 546, 549 (7th Cir.1979). Thus, the subsequent statements made on May 21 and June 3 by Farina revealing the secretive and illegal nature of the conspiracy to obtain the building permit were admissible. *Coe,* 718 F.2d 839. However, we request that in the future district courts give a limiting instruction stating that while such statements may be used as evidence revealing the nature and objective of the conspiracy, such statements should not be used as independent evidence establishing the defendant's participation in the conspiracy. The fact such an instruction was not given in this case, however, was harmless error since the independent evidence establishing that Tuchow joined the conspiracy was overwhelming. See the discussion in Section III–A of this opinion.

### III.

#### A. Sufficiency of the Evidence—Conspiracy.

■ Tuchow and Farina both contend that there was insufficient evidence to support their conviction for conspiracy to extort money under the Hobbs Act, 18 U.S.C. § 1951. Tuchow argues that the evidence failed to establish proof of an agreement between Farina and himself and that based upon the evidence presented, it was reasonable to infer that he was acting only as an attorney representing his client in obtain-

ing a building permit. Farina also argues that he merely introduced Walsh to Tuchow as an attorney who could represent Walsh in obtaining the building permit. The indictment in this case charged that "Martin Tuchow and Louis Farina, defendants herein, and divers [sic] other persons known and unknown to the Grand Jury, did knowingly, willfully· and unlawfully ... conspire ... to commit extortion ...." In order to establish a conspiracy, the government must prove that there was an agreement between two or more persons to commit an unlawful act, that the defendant was a party to the agreement, and that an overt act was committed in furtherance of the agreement by one of the coconspirators. *See, e.g., United States v. Roman,* 728 F.2d 846, 859 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983).

■ Tuchow's defense at trial was that he was simply charging a fee for his professional services in helping Walsh and the Kenton partnership obtain a building permit. However, sufficient evidence was introduced to rebut this defense and establish, beyond a reasonable doubt, that an illegal conspiracy existed between Tuchow and Farina. During a June 3, 1980 phone conversation between Farina and Tuchow, Farina explained that he had a "client" with a building permit problem and that "since it's in your [Tuchow's] ward, I think you should handle it and advise." Farina then told Walsh, "he'll take it from there, and that's it .... We got the right connection." The next day, Farina introduced Walsh to Tuchow in Tuchow's office. Tuchow told Walsh that his fee "won't be exorbitant, but it will be substantial," and that additional fees would be necessary in order to obtain the building permit, "if I'm gonna take this over, there might be somebody else involved, you know .... We're grown men." Prior to this June 4 meeting, Farina informed Walsh that he would need $1,000 to pay to Tuchow and after the meeting Farina told Walsh that the fee for the permit would be considerably higher

than the $10,000 previously quoted to Walsh. On June 11, Walsh gave Farina $1,000 to pass along to Tuchow. Farina also told Walsh that the cost to obtain the building permit would be approximately $47,000. During a later taped conversation on June 25, Tuchow asked Walsh whether he had given Farina the $1,000 and Walsh indicated that he had done so. The following day when Walsh went to City Hall to obtain the demolition authorization letter, Tuchow affirmed that his fee would be approximately $50,000 and that while the usual practice was to "pay up front" Tuchow would accept the payment at a later date since Walsh was Farina's friend. Finally, during a taped conversation in October of 1981, Tuchow told Walsh that Farina had given him only $500.00 of the initial $1,000 payment made in early June and that he (Tuchow) had given Farina $500.00 from one of the payments that Walsh had made in July.

Given the volume of evidence in the form of taped conversations between Walsh and Tuchow as well as between Walsh and Farina, the jury was justified in rejecting Tuchow's specious claim that the $50,000 payment represented his attorney fees for his help in obtaining a simple building permit. When viewed in the light most favorable to the government, there is more than sufficient evidence in this case to support both Tuchow's and Farina's convictions for conspiracy. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

### B. Interstate Commerce.

Tuchow next asserts that there was insufficient evidence introduced at trial to support his convictions under Counts IV, V, and VI charging him with attempted extortion[20] since Walsh was no longer involved in the Kenton Court project when he made payments to Tuchow and thus there could be no effect on interstate commerce. The

Hobbs Act, 18 U.S.C. § 1951(a), provides that anyone who "in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce" violates the terms of the Act. The three counts contained in the indictment charged that on July 24, 30, and October 21, 1980, Tuchow did "attempt to affect commerce ... by extortion as defined in Title 18 United States Code section 1951(b)(2), in that ... Tuchow did ... unlawfully obtain [$1,000] from Jack Walsh and J.C. Construction Co. ... said consent being induced by the wrongful use of fear of economic harm and under color of official right."[21]

Walsh testified that besides performing construction work, J.C. Construction Company also did window and window frame replacements, and that the window materials were ordered from firms outside of the state of Illinois. However, the construction portion of the business, except for the Kenton Court project, had not landed a construction or remodeling contract during 1980, although Walsh testified that he continued to bid on projects until late 1980 when the company went out of business. When Walsh withdrew as the general contractor for the Kenton Court project, he was replaced by another general contractor who ordered a significant amount of supplies from outside of Illinois.

Tuchow concedes that the required interstate commerce nexus needed to establish federal jurisdiction in this case is *de minimis*. *See United States v. Mattson*, 671 F.2d 1020, 1024 (7th Cir.1982) (holding that the Hobbs Act proscribes not only illegal acts that have an actual effect on interstate commerce, but also "threatened or potential effects which never materialized because extortionate demands are met"); *see also United States v. Glynn*, 627 F.2d 39, 41 (7th Cir.1980); *United States v. Price*, 617 F.2d 455, 457 (7th Cir.1979). Nevertheless, Tuchow contends

---

20. The indictment apparently charged attempted extortion since Walsh used FBI supplied money to pay off Tuchow. *See United States v. Rindone*, 631 F.2d 491, 493 (7th Cir.1980).

21. Walsh paid Tuchow $1,000 on July 30 and October 21, 1980 and paid Tuchow $2,000 on July 24, 1980.

that no actual effect on interstate commerce was demonstrated in this case since Walsh's J.C. Construction Company was not viable as it had obtained only one construction contract, the Kenton Court project, during the time in which Walsh owned the company.[22] Tuchow further contends that any potential effect on interstate commerce was negated when the FBI directed Walsh to withdraw in early July from the Kenton Court project, prior to the time the actual extortion payments were made.[23]

Tuchow's interpretation of the indictment in this case is much too narrow since he limits his argument to the fact that Walsh and J.C. Construction Company's trade in interstate commerce was not affected by his actions. Counts IV, V, and VI of the indictment in this case charged that Tuchow attempted to "affect interstate commerce" when he extorted money from Walsh.[24] The indictment does not charge that Walsh and J.C. Construction Company's trade in interstate commerce was affected. Rather, all counts contained in the indictment allege that Tuchow (and Farina) had attempted by their actions to affect commerce, one of the requisite elements of the offense.

The evidence in this case, when viewed in the light most favorable to the government, demonstrates that during the fall of 1980, when Walsh continued making extortion payments to Tuchow, Tuchow attempted to block the Kenton Court partnership's efforts to obtain a building permit. It was established at trial that the project, which was undertaken by another general contractor in the fall of 1980 shortly after Walsh withdrew, cost approximately $1.5 million and was built with over $400,000 of materials from outside of Illinois. In July, 1980, after Walsh indicated to Tuchow that he was withdrawing from the rehabilitation project, Tuchow expressed his dissatisfaction and told Walsh that he owed him money because of various commitments Tuchow had already made to other city employees. Walsh then agreed to pay Tuchow $10,000 of the original $50,000 negotiated payment.[25] During this conversation, Walsh informed Tuchow that the partnership was not willing to pay Tuchow's demanded fee, nor were they willing to reimburse Walsh for the money already spent. When Walsh asked Tuchow what would happen if the partnership attempted to ob-

22. Walsh purchased J.C. Construction Co. sometime in 1980.

23. Tuchow relies on *United States v. Elder,* 569 F.2d 1020 (7th Cir.1978), where our court held that the required interstate commerce nexus was not established where the indictment charged a continuing extortion and the company allegedly extorted had earlier ceased to purchase any materials outside of Illinois and had decided to dissolve during the time of the alleged extortion. For the reasons explained in this section of the opinion, the *Elder* decision is inapposite in this case.

24. The evidence presented at trial and the instruction given to the jury concerning the required nexus between the extortion payments and the effect on interstate commerce are consistent with the theory that by blocking the building permit, Tuchow affected interstate commerce. The interstate commerce instruction given at trial for all counts charged in the indictment is as follows:

"You may find that the interstate commerce element of the charge is satisfied if you find beyond a reasonable doubt:

"That some of the materials which were to be used in the rehabilitation of the Kenton Court project originated or would have originated outside the state of Illinois.

"In order to satisfy this element of the offense, the government need not prove that the defendant knew or intended that his actions would or could affect commerce. It is only necessary that the natural consequences of the defendant's acts would have been to probably or potentially affect commerce in any minimal way or degree.

This instruction embodies the "direct" effect theory (versus the indirect or "depletion-of-assets" theory) in explaining the required interstate commerce nexus. *See United States v. Mattson,* 671 F.2d 1020, 1023 n. 1 (7th Cir.1982). The defendant neither objected to nor proposed any other instruction detailing the required effect on interstate commerce.

25. Under the Hobbs Act, as long as the payment is made to an official because of his position, an act of extortion, as defined in 18 U.S.C. § 1951(b)(2), is committed. *See, e.g., United States v. Schmidt,* 760 F.2d 828, 830 (7th Cir. 1985); *United States v. Rindone,* 631 F.2d 491, 495 (7th Cir.1980).

tain the building permit, Tuchow responded, "it's up to them .... They won't get it through." Further, Noonan testified that sometime during July and October Tuchow instructed him not to authorize any transfer of the building permit.[26] Tuchow apparently believed that by holding up the permit during this time he was helping Walsh regain the money that Walsh had paid to Tuchow. Further, Tuchow had earlier expressed reluctance to deal with the Kenton Court partnership since he did not know the partners involved and he preferred to deal with Walsh. The logical inference from this evidence is that by blocking the permit during the fall of 1980 Tuchow was attempting to force the partnership not only to reimburse Walsh for the money Walsh already had spent, but also to force the partners to keep Walsh as their general contractor.[27] Certainly, the jury might very well have reasoned that Tuchow's order to block the partnership's efforts to obtain the permit during the period when Walsh was making these payments to Tuchow had a potential direct effect of interfering with the project and interstate commerce. *Mattson*, 671 F.2d at 1024; *Rindone*, 631 F.2d at 493.[28]

## C. Kenton Court Partnership.

▮▮▮ Count VII of the indictment charged that Tuchow attempted to extort $25,000 from Golding and the Kenton Court partnership. Tuchow again argues that his relationship with Golding was one of an attorney and client and thus there was insufficient evidence to support the jury's verdict under Count VII.

In the late summer of 1980, Golding met with Tuchow in an attempt to obtain the building permit. During their initial meeting Tuchow originally demanded $50,000; however, Tuchow agreed to accept a $25,000 payment instead. Tuchow points to the fact that Golding, who testified as a hostile witness for the government, considered the requested $25,000 payment as a legal fee for Tuchow's work in representing the partnership in related real estate and tax matters. However, this testimony was contradicted by Golding's earlier Grand Jury testimony wherein Golding testified that he never hired Tuchow as his attorney; that he believed he was being extorted by Tuchow's request for $25,000; and that be believed the partnership would not have obtained the permit but for Tuchow's help. Further, Golding testified that Tuchow told him that he needed the $25,000 to "take care of some people." After the partners agreed to pay this amount, the building permit was finally issued to their new general contractor late in the fall

**26.** During the conversation in which Tuchow and Walsh agreed on the $10,000 payment, Tuchow told Walsh that Walsh's withdrawing from the project had put him (Tuchow) in a "bad spot" because "I got Pat Noonan to go ahead and do that for me [issue the permit] on a promise...."

**27.** The transcript of the taped conversation between Walsh and Tuchow which occurred on October 1, 1980, reveals:

TUCHOW: "See, here's where we stand with that right now. The permit's in your name. What's your company?

WALSH: "J.C. Construction.

TUCHOW: "J.C. Construction. And the permit is in your name. If you wanna give them your permit you can assign it to them.

WALSH: "That's what I thought.

TUCHOW: "Now, if they wanna go with somebody else they've got to start from scratch. They cannot get your permit. I already went up there to make sure.

WALSH: "Okay, okay.

TUCHOW: "I wanna put you in a position where at least let'em come to you.

WALSH: "Yeah. Okay, that's what I thought too.

TUCHOW: "That's exactly."

**28.** In his brief, Farina adopts by incorporation Tuchow's argument that his conviction under Counts II and III must be reversed as interstate commerce was not affected by his actions. Although not clearly set forth in his brief, we reject his apparent challenge to the sufficiency of the evidence on these counts. His indictment charges that he affected commerce when he extorted money from Walsh on June 3 and 11. At this time Walsh was clearly acting on behalf of the Kenton Court partnership which was about to invest considerable sums of money in the rehabilitation project. As indicated, the project did eventually use over $400,000 of materials from outside the State of Illinois. Thus, Farina's actions did have a potential effect on interstate commerce.

of 1980. Viewing the evidence presented in the light most favorable to the government, sufficient evidence was introduced to affirm Tuchow's conviction on this extortion count.

## IV.

Tuchow next argues that he was deprived of a fair trial because of the court's unprovoked hostility and bias toward his defense counsel. He also claims that the jury was improperly instructed with respect to the issue of reputation evidence and that he was denied his right of allocution as required by Fed.R.Crim.P. 32(a)(1).

The defendant argues that the court expressed such hostility toward his attorney at trial that his defense was unduly prejudiced. The first incident occurred when Tuchow's attorney objected to Art Radek's testimony concerning what Walsh had told Radek during an earlier meeting. The court instructed the jury that this evidence was not being offered to prove the truth of the matter asserted in Walsh's statements made to Radek, but was instead offered to prove the fact that the statements had been made. The court explained to Tuchow's attorney that "I understand your objection is continuing." Tuchow's attorney then made a series of objections during Radek's testimony regarding other conversations that Radek had with Walsh, Noonan, and Kaplan. The court instructed counsel that its same ruling applied to these conversations. After another objection, the court and Tuchow's attorney engaged in the following exchange:

MR. CROWLEY: "Your Honor, I don't know if it is necessary for me to repeat the objection as to each one of these separate conversations.

THE COURT: "No, it isn't.

MR. CROWLEY: "All right.

THE COURT: "And this is almost entirely nonhearsay anyway, and to the extent it might have some material that requires an instruction to the jury, I have given that instruction.

MR. MURTAUGH: "Just so the record is clear, Mr. Farina joins in the objection.

THE COURT: "Yes, all right. Now, the point of handling these things in advance is to avoid interrupting the flow of the testimony. Now, let's not interrupt the flow of the testimony unnecessarily to raise objections that I have already indicated are standing objections.

The record is clear, proceed.

MR. CROWLEY: "Your Honor, so that the record is clear, I have a standing objection—

THE COURT: "The record is clear. Proceed, Mr. Schweitzer.

MR. CROWLEY: "All right, thank you.

BY MR. SCHWEITZER:

"Q: Sir. when did you speak—

THE COURT: "The record was clear before we ever entered into this courtroom, and you know it.

"Proceed."

The second incident occurred during the cross-examination of Herzog, a witness who testified as to Tuchow's "other acts" during the time of the alleged extortion. During this cross-examination, Tuchow's counsel began to ask Herzog whether he knew if Tuchow was married, had any children, and if he was aware that Tuchow had gone to law school late in life. At this point, the trial court judge interrupted (apparently the government's attorney was already on his feet ready to object) and informed Tuchow's attorney that he was not going to allow this line of questioning since it was not within the scope of direct examination. When Tuchow's counsel attempted to explain what he was trying to accomplish, the judge then requested a sidebar "to see what the next question is going to be." Tuchow's attorney told the court that "I am going to go to a different area, your Honor." And the court responded "I'm going to have to screen the questions if I cannot trust you to ask proper questions. Come on over." At the sidebar Tuchow's counsel argued that since the government attorney had asked Golding if he knew whether Tuchow was a lawyer and a ward committeeman he was also entitled to ask

Golding questions about Tuchow's status. The district court told Tuchow's counsel that his questions had nothing to do with what was asked during direct examination and that if he did ask such questions he would "sit" on the attorney "good and hard ... in the presence of the jury ...."

█ After reviewing the record, we conclude that the judge's statements made in the presence of the jury fail to rise to a level of prejudicial error. As to the first incident, after the initial encounter between the judge and defense counsel, concerning counsel's continuing objection, the defense counsel explained to the district court that he had misunderstood that the district court considered his objections to be continuing throughout Radek's testimony. After hearing this explanation the district court apologized to defense counsel for the misunderstanding and then later explained to the jury that "I am satisfied that Mr. Crowley ... was not being intentionally disruptive. I apologized to him at that time for the remark I made, and I now request that you too disregard that remark." The judge's original remarks did not appear to be harsh and his subsequent apology to defense counsel and explanation to the jury certainly eliminated any possible prejudice.

█ As to the second occurrence, it appears that defense counsel was attempting to introduce evidence of Tuchow's background through Herzog, as Tuchow elected not to testify in this case. The defense counsel breached the boundary of permissible cross-examination since these questions were well beyond the scope of direct examination. A trial court must necessarily be granted wide latitude in determining the proper scope of cross-examination, *see, e.g.,* *United States ex rel. Blackwell v. Franzen,* 688 F.2d 496, 500 (7th Cir.1982), and in this case the district court determined that the defense counsel's cross-examination exceeded the permissible boundary. While

the district court's comment in front of the jury that he would have to "screen defense counsel's questions if I cannot trust you to ask proper questions" appears, in isolation, to be a harsh admonishment, our review of the record reveals that this single comment taken in the context of the entire three-week long trial, in which the proof of guilt was substantial, failed to prejudice the defendant's case. *See United States v. Sennett,* 505 F.2d 774, 779 (7th Cir.1974); *cf. United States v. Blakey,* 607 F.2d 779, 788 (7th Cir.1979).[29]

█ Tuchow also claims that the jury was improperly instructed with respect to the issue of reputation evidence. During trial Tuchow had several witnesses testify as to his good character. The contested jury instruction read in part:

> "The circumstances may be such that evidence of good character may alone create a reasonable doubt of defendant's guilt, or although without it the other evidence would be convincing. However, evidence of good reputation should *not constitute an excuse to acquit* the defendant, if the jury, after weighing all the evidence including the evidence of good character is convinced beyond a reasonable doubt that the defendant is guilty of the crime charged in the indictment."

Tuchow relies on *United States v. Leigh,* 513 F.2d 784 (5th Cir.1975), where the Fifth Circuit ruled that similar language as that italicized above was improper and constituted reversible error. However, in *United States v. Picketts,* 655 F.2d 837, 842 (7th Cir.1981), we distinguished the *Leigh* case and held that the same instruction as given in this case was proper. *See also United States v. Hyman,* 741 F.2d 906, 910-11 (7th Cir.1984) citing *Picketts* with approval. While we would ask that district courts use the Seventh Circuit Pattern Instruction which does not employ the "excuse to acquit" language, the fact that such lan-

---

**29.** Tuchow further alleges that the district court's treatment of the defense counsel's objections during trial, as compared to that of the government's, indicated an unfavorable slant toward the government's case. However, after reviewing the record, and specifically those areas of concern to the defendant, we find his argument to be without merit.

guage is used in the instruction does not constitute reversible error as long as the phrase "including the evidence of good character" is included in the instruction. *Picketts,* 655 F.2d at 842; *see also* Fed. Crim. Jury Instructions of the Seventh Circuit, § 3.15 (1980).

▇ Finally, we hold that since both the government and the defendants agree that Tuchow and Farina were denied the right of allocution under Fed.R.Crim.P. 32(a)(1)(C) at the sentencing hearings, this case must be remanded back to the district court to allow the defendants the opportunity to make a statement on their own behalf before the sentence is imposed.

### V.

We affirm the defendants' convictions on all counts and remand this case back to the district court to allow the defendants an opportunity to exercise their right of allocution.